JOINER, Judge.
Joshua Eugene Russell was convicted of one count of capital murder for causing the death of Anniston Police Officer Justin David Sollohub while Officer Sollohub was on duty, see § 13A-5-40(a)(5), Ala. Code 1975. During the penalty phase of Russell's trial, the jury, by a vote of 8 to 4, recommended that Russell be sentenced to life imprisonment without the possibility of parole.
*1142 After receiving a presentence-investigation report and conducting a sentencing hearing, the circuit court overrode the jury's recommendation, finding that the aggravating circumstances "far outweigh[ed]" the mitigating circumstances, and sentenced Russell to death.[1] Russell filed a motion for a new trial, which the trial court denied. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-53, Ala. Code 1975.
Facts
The evidence at trial established the following: At approximately 10:30 A.M. on August 24, 2011, Russell visited Darrell Dorsey at Dorsey's mother's house on Moore Street in Anniston. Dorsey and Russell had a brief conversation, and while they were speaking Dorsey noticed Russell was carrying a gun on his hip. Russell left and went to a house at the corner of Moore Avenue and 19th Street around 11:00 A.M. Russell spoke to the people sitting on the front porch, and, as he walked away from the house, Officer Sollohub pulled up in his patrol car and stopped Russell. Officer Sollohub put out a call on his radio that he was "out with a black male" at Moore Avenue and 19th Street. Officer William Bostick heard Officer Sollohub's radio call and responded to that location. Officer Sollohub was conducting a pat-down search of Russell when Officer Bostick arrived. As Officer Bostick approached Russell and Officer Sollohub, Russell said to Officer Bostick, "I know you, don't I?," to which Officer Bostick replied, "Yes, you do." At that point, Russell "took off running," and Officer Sollohub followed Russell on foot. Officer Sollohub put out a call that he was in a foot pursuit of a black male. After hearing the call, several officers made their way to Officer Sollohub's general location to provide assistance. Officer Bostick returned to his patrol car to pursue Russell.
Officer Sollohub chased Russell down an alleyway and into the backyard of a nearby residence where Karen Mason and her son, Justin Beard,[2] were washing a car. While in the backyard, Russell pulled out a gun and shot Officer Sollohub once in the head. Russell then fled the scene and attempted to enter a house on McCoy Avenue where Margaret Gilley and her daughter, Tyler, resided. Gilley told Russell that he could not come into the house, so Russell ran into a vacant house across the street.
When Investigators Justin Hartley and Kyle Price of the Anniston Police Department ("APD") arrived at the scene of the shooting, Beard was standing in the alleyway behind the backyard where Officer Sollohub had been shot, frantically pointing toward the house. Officer Sollohub was lying on the ground motionless and unresponsive, and his firearm remained in its holster. Emergency medical personnel transported Officer Sollohub to the University of Alabama at Birmingham ("UAB") Hospital,[3] where he later died.
After arriving at the scene of the shooting, Officer Bostick was ordered "to go out *1143 and get the guy" who shot Officer Sollohub. Officer Bostick began driving around the neighborhood, and, while driving on 20th Street, Officer Bostick saw Russell run out of and back into a nearby wooded area. Shortly thereafter, officers created a perimeter around the wooded area where Officer Bostick had last seen Russell.
After he fled the scene, Russell telephoned Shandrika Dotson and asked her if she had heard what happened. Dotson responded that she heard that Russell had shot a police officer. Russell replied "sort of, kind of" and then hung up. Russell also called his sister, Cheryl Bush. Russell told Bush that he was scared because someone was chasing him, and he asked her to come get him. Bush then went to her and Russell's father's apartment, where police officers subsequently appeared and asked Bush to contact Russell. Bush attempted-unsuccessfully-to persuade Russell to turn himself in.
Investigator David Cash, the district attorney's investigator assigned to the Calhoun-Cleburne drug and violent-crime task force, participated in the search for Russell. Investigator Cash testified:
"Investigator NeSmith and [I] were walking the fence line. We saw what we believed to be a body lying against the edge of the fence. We started giving loud verbal commands to show hands, so he got up and ran. We gave chase through the wood line, and he was apprehended just down from where he had ran."
(R. 1116-17.) After Russell was apprehended, Investigator Cash discovered the firearm-a .22 caliber Taurus brand pistol-used to shoot Officer Sollohub lying "approximately 10 feet out of reach from where [Russell] was taken into custody." The thumb safety on the pistol was on when it was discovered.
Russell was transported to the Anniston City jail, where he gave a video-recorded statement to Sgt. Chris Sparks and Investigator Tom Suits of the APD. The State played for the jury a redacted version of Russell's statement, which is summarized as follows:
Russell had left a friend's house and was walking down the street when Officer Sollohub stopped him and asked him if he knew a particular person.[4] Russell did not know why Officer Sollohub stopped him, but Officer Sollohub asked Russell for his identification and began conducting a pat-down search. Russell explained that when Officer Sollohub stopped him he had outstanding warrants and that the gun, a .22 caliber Taurus brand pistol, was stolen. Russell stated:
"I just take off running, I run down the street, I running around the house, he run around the house. You know, I had a gun, know what I'm saying, I ain't, I just held it up. I was goin' scare his ass, but, like, by the time I held it up and he came around the corner, like, it like, he grabbed and I jerked, and he just got hit."
(State's Exhibit No. 29.)
Sgt. Sparks told Russell that he did not believe that Officer Sollohub had grabbed the gun, to which Russell replied that Officer Sollohub "turned the corner and I held the gun up at the same time" and that Officer Sollohub "was trying to brace himself." Russell stated: "I didn't think he was that close on me, I thought he was still coming around from the other side .... I was just goin' scare him." Russell explained that his reasoning behind scaring Officer Sollohub with the gun stemmed from an earlier incident in which he pointed a cellular telephone at a police officer as if *1144 the telephone was a gun. Russell stated: "I seen the way he reacted so I just figured maybe if I do [Officer Sollohub] the same way, this'll make him run on and I can go about my business." Russell could not recall whether Officer Sollohub had his firearm drawn during the chase.
After Russell shot Officer Sollohub, he picked the gun up off the ground before running across the street and hiding in a field, where he was apprehended approximately seven hours later. While Russell was hiding, he could see the officers searching for him; Russell stated that he "started to shoot some more but I didn't." Russell further stated:
"I really coulda got away for real.... I was running away and I turned around to look at [Officer Sollohub]. I hesitated, I started to run back to him, and I was like, 'Fuck that, hell nah. I be a damn fool.' But I kind paused for a minute. I was debating should I keep going or should I go back and help his ass .... I don't want nobody to die."
(State's Exhibit No. 29.) Russell apologized "for what happened" and stated, "I was wrong but at the same time, [Officer Sollohub] knows what he did." When asked to elaborate, Russell said, "He knows how it all went down. I can't really explain. It would take both of us to explain but he knows how it went down, though he's in the hospital, wherever he at .... He asked me my information, I gave it to him."
Investigator Mark Osburn of the APD crime-scene unit collected a spent cartridge casing from the scene of the shooting, and he collected the pistol and Russell's cellular telephone from where Russell was apprehended. Investigator Osburn forwarded the pistol and the cartridge casing to the Alabama Department of Forensic Sciences ("ADFS"), and he forwarded the cellular telephone to the U.S. Secret Service.
Dr. Emily Ward, a state medical examiner for the ADFS,[5] conducted an autopsy on Officer Sollohub's body. Dr. Ward testified that Officer Sollohub died as a result of the gunshot wound to his head and that the gun was "probably no more than three inches away when the trigger was pulled. Maybe four, but less than six absolutely."
Derrick Headley, a forensic scientist for the firearm and tool-mark section of the ADFS, examined the Taurus pistol and the fired .22 caliber cartridge casing. Headley explained that the pistol has three types of safeties-a thumb safety that blocks the trigger from being pulled and blocks the slide from functioning; a magazine safety that prevents the gun from firing if the magazine is not inserted; and an internal safety that disconnects the sear from the hammer so that the user must pull the trigger each time he fires the gun. Headley stated that the user "has to actively do something to disallow [the thumb and magazine] safeties to work" and that the Taurus has a nine-pound trigger pull. Headley testified:
"A. ... [T]o give you an idea about how much pound-one thing is hard to figure out how much nine pounds would be. If you've ever picked up a gallon of milk or a gallon of water with your finger, with just one finger, a gallon of water weighs approximately eight pounds. So with a gun with a nine pound trigger pull, it will take little more force than what it will take for you to pick up a gallon of water to pull that trigger back to make it go off."
"....
*1145 "Q. You take this gun, one in the chamber, safety off, magazine in place, in your hands?
"A. Something would have had to pull back nine pounds worth of the pressure on the trigger.
"Q. With my hitting the gun, grabbing the gun, have made that gun go off?
"A. I would not expect it to, no.
"Q. Would my hitting your arm, grabbing your arm, have made that gun go off?
"A. I wouldn't expect it, but I can't say that it can't.
"Q. Ultimately, somebody is going to have to put one pound more than a gallon of water's pressure right here (pointing) for this gun to expel a bullet?
"A. Correct."
(R. 1464-67.)
On cross-examination, Headley elaborated on his testimony that he could not rule out the possibility that the gun fired inadvertently:
"Q. ... [I]f somebody was holding that gun and somebody grabbed it, the person who is holding his arm, grabbed at his arm, you couldn't rule out that the gun could accidentally go off. Did I hear you say that?
"A. Yes. There are-I can't say that there is no way for the gun to inadvertently go off. To put that in perspective, the gun when I tested it in my laboratory, the gun worked as it was suppose[d] to, the safeties as they were designed to. And it did not accidentally or inadvertently discharge on me. I had to manually do something, I had to physically do something to the gun to make it discharge. I had to remove the safeties, pull the trigger, etc., for that to discharge.
"....
"Q. But you can't rule that out?
"A. I can't say with 100 percent certainty that a gun could not be accidentally discharged."
(R. 1476-77.)
Jesse Poore testified that his .22 caliber pistol was stolen from his truck at some point between 6:00 P.M. on August 8, 2011, and 3:30 P.M. on August 9, 2011. Brendan Morgan, then of the United States Secret Service electronic-crimes task force,[6] analyzed Russell's cellular telephone and discovered a photograph of a pistol that had been taken at 1:48 P.M. on August 9, 2011.
Terrence McCurdy, who was dating Russell's cousin in August 2011, testified that about a week before the shooting, he and Russell had a conversation during which Russell stated, "I'm not going back to jail." On cross-examination, McCurdy clarified that their conversation was positive in nature and that it was "[j]ust a general conversation about anything that had happened prior in [Russell's] life that he would make changes to keep from going back to jail."
At the close of the evidence, both the State and Russell presented closing arguments, and the trial court charged the jury. The jury returned a verdict of guilty as charged in the indictment.
Standard of Review
On appeal from his conviction and sentence, Russell raises numerous issues, including some that were not raised in the trial court. Because Russell has been sentenced to death, however, this Court must review the trial-court proceedings *1146 under the plain-error doctrine. See Rule 45A, Ala. R. App. P.
" ' "Plain error is defined as error that has 'adversely affected the substantial right of the appellant.' The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed. 2d 1 (1985), the plain-error doctrine applies only if the error is 'particularly egregious' and if it 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed. 2d 1012 (1999)." '
" Ex parte Brown, 11 So.3d 933, 935-36 (Ala. 2008) (quoting Hall v. State, 820 So.2d 113, 121-22 (Ala. Crim. App. 1999) ). See also Ex parte Walker, 972 So.2d 737, 742 (Ala. 2007) ; Ex parte Trawick, 698 So.2d 162, 167 (Ala. 1997) ; Harris v. State, 2 So.3d 880, 896 (Ala. Crim. App. 2007) ; and Hyde v. State, 778 So.2d 199, 209 (Ala. Crim. App. 1998) ('To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.'). Although the failure to object in the trial court will not preclude this Court from reviewing an issue under Rule 45A, Ala. R. App. P., it will weigh against any claim of prejudice made on appeal. See Dotch v. State, 67 So.3d 936, 965 (Ala. Crim. App. 2010) (citing Dill v. State, 600 So.2d 343 (Ala. Crim. App. 1991) ). Additionally, application of the plain-error rule
" ' " 'is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." ' " Whitehead v. State, [ 777 So.2d 781] , at 794 [ (Ala. Crim. App. 1999], quoting Burton v. State, 651 So.2d 641, 645 (Ala. Crim. App. 1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed. 2d 862 (1995).'
" Centobie v. State, 861 So.2d 1111, 1118 (Ala. Crim. App. 2001)."
Phillips v. State, [Ms. CR-12-0197, December 18, 2015] --- So.3d ----, ---- (Ala. Crim. App. 2015).
Discussion
Guilt-Phase Issues
I.
Russell contends that the trial court erred during the jury-selection process. Specifically, Russell contends that the trial court erred by death-qualifying the jury, by failing to excuse a veniremember for cause, and by failing to recognize that the State used its peremptory strikes in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. 2d 69 (1986). We address each of Russell's issues in turn.
A.
Russell contends that "death-qualifying the jury produced a conviction prone jury."[7] (Russell's brief, p. 94.) Russell did not raise this issue in the trial court; therefore, we review this claim for plain error only. See Rule 45A, Ala. R. App. P.
" 'In Davis v. State, 718 So.2d 1148 (Ala. Crim. App. 1995) (opinion on return to remand), aff'd, 718 So.2d 1166 (Ala. 1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed. 2d 112 (1999), we stated:
*1147 " ' "A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed. 2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala. Cr. App. 1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed. 2d 137 (1986). Neither the federal nor the state constitution prohibits the state from ... death-qualifying jurors in capital cases. Id.; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala. Cr. App. 1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed. 2d 687 (1993)."
" ' 718 So. 2d at 1157. There was no error in allowing the State to death qualify the prospective jurors.' "
Phillips, --- So.3d at ---- (quoting Brown v. State, 11 So.3d 866, 891 (Ala. Crim. App. 2007) ).
The trial court did not commit any error-plain or otherwise-in death-qualifying the prospective jurors. Accordingly, Russell's claim is without merit, and he is not entitled to relief on this issue.
B.
Russell contends that the trial court erred when it failed to sua sponte remove potential juror J.J. for cause because, he says, J.J. "indicated he would automatically vote for the death penalty" and that such error "unfairly restricted [his] peremptory strikes and violated his right to a fair jury selection process."[8] (Russell's brief, p. 74.) Further, Russell claims that his use of a peremptory strike to remove J.J. did not cure the trial court's error because, he says, "several biased veniremembers ended up on the jury." (Russell's brief, p. 76.) Because Russell raises this claim for the first time on appeal, we review this issue for plain error only. See Rule 45A, Ala. R. App. P.
"A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence of absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views...."
Morgan v. Illinois, 504 U.S. 719, 729, 112 S.Ct. 2222, 2229-30, 119 L.Ed. 2d 492 (1992).
" ' "[T]he Alabama Supreme Court has held that the failure to remove a juror for cause is harmless when that juror is removed by the use of a peremptory strike. Bethea v. Springhill Mem'l Hosp., 833 So.2d 1 (Ala. 2002)." Pace v. State, 904 So.2d 331, 341 (Ala. Crim. App. 2003). Cf. Ex parte Colby, 41 So.3d 1 (Ala. 2009) (may not be harmless when multiple challenges for cause are involved).
" 'Moreover,
" ' "To justify a challenge for cause, there must be a proper statutory ground or ' "some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court." ' Clark v. State, 621 So.2d 309, 321 (Ala. Cr. App. 1992) (quoting Nettles v. State, 435 So.2d 146, 149 (Ala. Cr. App. 1983) ). This court has *1148 held that 'once a juror indicates initially that he or she is biased or prejudiced or has deepseated impressions' about a case, the juror should be removed for cause. Knop v. McCain, 561 So.2d 229, 234 (Ala. 1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala. 1995). A juror 'need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.' Kinder v. State, 515 So.2d 55, 61 (Ala. Cr. App. 1986)."
" ' Ex parte Davis, 718 So.2d 1166, 1171-72 (Ala. 1998).
" ' "The test for determining whether a strike rises to the level of a challenge for cause is 'whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence.' Marshall v. State, 598 So.2d 14, 16 (Ala. Cr. App. 1991). 'Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.' Ex parte Nettles, 435 So.2d 151, 153 (Ala. 1983). 'The decision of the trial court "on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion." 'Nettles, 435 So.2d at 153."
" ' Dunning v. State, 659 So.2d 995, 997 (Ala. Crim. App. 1994).
" ' "The qualification of a juror is a matter within the discretion of the trial court. Clark v. State, 443 So.2d 1287, 1288 (Ala. Cr. App. 1983). The trial judge is in the best position to hear a prospective juror and to observe his or her demeanor." Ex parte Dinkins, 567 So.2d 1313, 1314 (Ala. 1990). " '[J]urors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the Court.' Johnson v. State, 820 So.2d 842, 855 (Ala. Crim. App. 2000)." Sharifi v. State, 993 So.2d 907, 926 (Ala. Crim. App. 2008).
" ' "It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination techniques that frequently are employed ... [during voir dire].... Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge may properly choose to believe those statements that were the most fully articulated or that appeared to be have been least influenced by leading."
" ' Patton v. Yount, 467 U.S. 1025, 1039, 104 S.Ct. 2885, 81 L.Ed.2d 847, 81 L.Ed. 847 (1984).' "
Phillips, --- So.3d at ---- (quoting Thompson v. State, 153 So.3d 84, 115-16 (Ala. Crim. App. 2012) ).
During voir dire, the prosecutor stated:
"So, what makes a case a capital-murder case? There are certain offenses, about 14 of them, that are set out by law, by the legislature. They include the intention[al] killing of a child, intentional killing during a rape or sodomy, intentional killing during a robbery or a burglary, and the intentional killing of [a] law-enforcement officer in the conduct of his duties."
*1149 (R. 254.) The prosecutor subsequently asked, "Anybody feel like 'I would always give the death penalty?' If there's a murder, and it's one of these circumstances, we ought to give the death penalty every time? Anybody feel that way?" The prosecutor and potential juror J.J. had the following exchange:
"[J.J.]: What you said, would you give it in any of those cases you mentioned, I don't know all 14, 16, or however you said it, but yeah, I would say, the ones you mentioned that for policeman, rape or sodomy of a child, I would be for it.
"[The State]: Always?
"[J.J.]: Yeah, I can't see any mitigating circumstances."
(R. 262.) The trial court, the State, and Russell's counsel later questioned J.J. during individual voir dire:
"THE COURT: We just have a question. When you were having a discussion during the panel on voir dire, you said that you would vote for the death penalty.
"[J.J.]: Yes, sir.
"THE COURT: As a matter of fact, you said that death would always be a possibility. What I need to find out is by the same token, let's say that the State presented the testimony, and obviously, both sentences would be an option, either death or life without parole. Could you give equal consideration to both of those, or are you saying that you would automatically vote for the death penalty regardless of-let's say that the defendant put forth mitigating evidence, mitigation or something to lessen him qualifying for the death penalty.
"What I mean by that, let's say he had an awful upbringing. Let's say there was drug use in his family, that, you know, he was beat by his mom and dad and all this different stuff. I'm not saying that's here in this case. I'm just talking hypothetically.
"So if those were all factors, could you still consider life without as a possibility, or are you saying you'd still vote for the death penalty regardless of any mitigation that was presented?
"[J.J.]: I would have to consider anything that was presented, obviously, but what I was trying to say, I cannot envision in my mind, like right now, any mitigating circumstance that would rise to the level of precluding that judgment. I mean, I find it very difficult to believe that-can I expound?
"THE COURT: Yes, please. That's why we got you in here by yourself. Tell us what you think.
"[J.J.]: Mainly, because my view on that one I feel very strongly about personal responsibility and regardless of things that happen, it was a decision that was made. I mean, maybe there is something that I haven't thought about, but when you asked the question, I'm like I can't think of any mitigating circumstances, given that type of crime, that the district attorney mentioned. I mean, he mentioned two or three. I can't imagine a single one of those that would-
"THE COURT: But let's say as the Judge, that I direct you that the law says that you must consider life without, give it equal consideration to the death penalty, that you must consider both of those. Could you consider and could you find yourself under some circumstances voting for life without in this case rather than just automatically saying, 'I don't want to hear anything.'
"[J.J.]: I wouldn't say that. I mean, I'd have to think about it, but I mean, my tendency-my beginning point would be very difficult. It would be almost-my beginning point would be very difficult to say I was extremely-exactly *1150 neutral at the beginning. Does that make sense?
"THE COURT: It does. It makes perfect sense. But could you-I guess-
"[J.J.]: Yeah, you're welcome to. Yes, sir. Yes, sir, I would.
"THE COURT: Okay. Well, let me ask-[defense counsel], questions?
"[Defense counsel]: What I hear you saying, [J.J.], is that what you know about that case right now-
"[J.J.]: Yes, sir.
"[Defense counsel]: -if you found and if you return a verdict beyond a reasonable doubt of capital murder, that you would vote to impose the death penalty?
"[J.J.]: From what I know right now?
"[Defense counsel]: Yes, sir.
"[J.J.]: And I did say I read some about it on AL.com [an Internet site devoted to Alabama news].
"[Defense counsel]: That was going to be my next question. Can you tell us what you know about it?
"[J.J.]: What I know is very little. What I understand, there was a shooting, I believe in Anniston, if I remember correctly. And the defendant supposedly had shot a police officer, shot and killed a police officer.
"[Defense counsel]: And you got that from AL.com.
"[J.J.]: AL.com. I don't remember which, Birmingham or Huntsville or which said that.
"[Defense counsel]: Do you remember when-did you get it recently or-
"[J.J.]: I mean, when it happened, it was on there for several days. I don't-a year ago, year and a half ago maybe.
"[Defense counsel]: All right. When you got your jury questionnaire, did you then inquire about what the case was about?
"[J.J.]: Not with the questionnaire. I did when I got the initial summons. I said, like, I don't want to be on a capital murder trial. I was, like, what capital crimes are in Lee County, and I saw the name. I got the questionnaire, and obviously, I saw. The summons came before the questionnaire. So when I saw that, I was, like, oh. This one had been transferred here. I knew the Auburn University football player that got shot at the apartment complex. I knew that one. I mean, there are several that would be tried here, and that's all I knew. So definitely, I recognized the name when the questionnaire came through.
"[Defense counsel]: I appreciate your honesty.
"THE COURT: [J.J.], let me ask you this, too: Now, knowing what you know and what you've read, however scant and however involved, could you put that aside, whatever you've read or any prior knowledge you may have of the case if you were chosen as a juror based solely from the testimony from this witness stand and from the documents or evidence that were introduced-or let's say you knew something that wasn't presented for whatever reason, could you put that out of your mind and make a determination on the guilt or the innocence of the defendant based solely on what comes from this courtroom, or are you still going to have that lingering thought in your mind about something you didn't know that may come up during the trial?
"[J.J.]: I think I'd have to. I don't know if I know enough detail about it to-I mean, the level of detail that I know is what I just told you guys.
"THE COURT: Very scant.
"[J.J.]: Yeah, and I can't imagine that it wouldn't come out that would be the argument that was given that the trial is a capital murder trial.
*1151 "[The State]: Judge, again, using the same language the Court has used previously. If the Court ordered you to consider life without and death and to take certain aggravators and certain mitigators and weigh and make a decision, you could consider both?
"[J.J.]: Yes, sir. If the Court ordered me, yes, I could-
"[The State]: And you said you can't think of anything, but at this point, you don't know a single clue of what those things might be; right?
"[J.J.]: That is true.
"[The State]: I mean, it could be-it could be something amazing, that would be, like, wow, that explains it to me?
"[J.J.]: That's true, but again, my prior belief would be that, I can't-I just can't-
"[The State]: But you could follow the Court's order?
"[J.J.]: Yes, sir, I would."
(R. 422-31.)
"To successfully remove a juror for cause the challenge must be based on the statutory grounds set out in § 12-16-150, Ala. Code 1975, or related to a matter that imports absolute bias on the part of the juror. See Tomlin v. State, 909 So.2d 213, 235-36 (Ala. Crim. App. 2002), rev'd on other grounds, 909 So.2d 283 (Ala. 2003)."
Sneed v. State, 1 So.3d 104, 137 (Ala. Crim. App. 2007).
A review of the record on appeal demonstrates that J.J. was not due to be removed for cause under any of the statutory exclusions of § 12-16-150, Ala. Code 1975. Moreover, J.J. did not demonstrate "absolute bias." Russell correctly points out that J.J. repeatedly acknowledged that he would be in favor of imposing the death penalty for a person convicted of killing a police officer and that he could not, based on his knowledge of Russell's case at that time, entertain any possible mitigating circumstances.[9] J.J. also stated, however, that he "would have to consider anything that was presented" at trial, and he mentioned the possibility of circumstances he had not yet considered. J.J. then acknowledged that he would follow the trial court's orders and that, if so ordered, he would appropriately weigh the aggravating and mitigating factors and would consider both life imprisonment without the possibility of parole and the death penalty as possible sentences. Accordingly, the trial court did not commit error, plain or otherwise, when it did not sua sponte remove potential juror J.J. for cause.
As noted above, Russell's counsel did not challenge J.J. for cause, and he used a peremptory strike to remove J.J. from the venire. Any error, therefore, was harmless. See Albarran v. State, 96 So.3d 131, 162-63 (Ala. Crim. App. 2011) (quoting Pace v. State, 904 So.2d 331, 341 (Ala. Crim. App. 2003) )("[T]he failure to remove a juror for cause is harmless when that juror is removed by the use of a peremptory strike."). Russell, however, contends that any error was not harmless because he "was forced to use a peremptory strike" to remove J.J., and, as a result, "several biased veniremembers ended up on the jury." (Russell's brief, p. 76.) Specifically, Russell argues that, "[g]iven the circumstances of the case, the inclusion of jurors [D.C. and D.E. who had] family in law enforcement was particularly prejudicial." (Russell's brief, p. 76.)
To support his argument, Russell cites Ex parte Colby, 41 So.3d 1 (Ala. 2009), for the proposition that a trial court's error in failing to grant for-cause strikes is not *1152 harmless where the jury ultimately includes "jurors who would likely have been the subject of peremptory challenge if challenges were available." (Russell's brief, p. 76.) The Supreme Court of Alabama described Colby as follows:
"Colby made separate motions for the removal of [potential jurors] C.F., M.B., and R.M. from the jury, and the trial court denied each motion separately. Each of those denials was error. The State ... argues that any error was harmless, because, according to the State, an impartial jury was ultimately seated. However, '[i]n each instance in which we have applied the harmless-error rule, we have been presented with only one erroneous ruling on a challenge for cause.' General Motors[ Corp. v. Jernigan ], 883 So.2d [646,] 672 [ (Ala. 2003) ]."
41 So.3d at 7.
Unlike Colby, which involved a challenge to the denial of motions to remove three jurors for cause, Russell's case involves only one juror who Russell claims the trial court should have removed, sua sponte, for cause. Thus, Russell's case is distinguishable from Colby. See General Motors, 883 So.2d at 672 ("Because Ross[ v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed. 2d 80 (1988) ], United States v.] Martinez-Salazar [, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed. 2d 792 (2000) ], Bethea[ v. Springhill Memorial Hospital, 833 So.2d 1 (Ala. 2002) ], and Turner[ v. State, 160 Ala. 55, 49 So. 304 (1909) ], all involved only one juror, those cases can be distinguished" from cases involving trial courts' multiple errors denying challenges for cause.). Accordingly, Russell is not entitled to relief on this claim.
C.
Russell contends that the State used its peremptory strikes in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. 2d 69 (1986).[10] Because Russell did not raise this claim at trial, we question whether this issue is properly before this Court.
This Court has stated:
"[A] review of caselaw indicates that 'both the federal and state courts have consistently held that the failure to make a timely [ Batson or J.E.B. ] objection effectively waives any arguments based on improprieties in jury selection which the defendant might urge pursuant to Batson.' Brian J. Serr & Mark Maney, Racism, Peremptory Challenges and the Democratic Jury: The Jurisprudence of a Delicate Balance, 79 J. Crim. L. and Criminology 1, 19 (1988). The Eleventh Circuit has explained:
" 'In United States v. Rodriguez, 917 F.2d 1286 (11th Cir. 1990), this court recognized that the Supreme Court's Batson [v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986),] analysis envisioned a "timely objection" and thus held that "an inquiry into the government's exercise of its peremptory challenges is initiated by a defendant's timely objection." Rodriguez, 917 F.2d at 1288 n.4. The failure to make a timely Batson objection results in a waiver of the claim.'
" United States v. Cashwell, 950 F.2d 699, 704 (11th Cir. 1992)."
White v. State, 179 So.3d 170, 198 (Ala. Crim. App. 2013) (questioning whether White's J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), issue was proper for plain-error review).
Here, Russell failed to raise his Batson objection at trial. Therefore, this issue does not appear to be properly *1153 before this Court for review. Even if, however, a Batson issue is subject to plain-error review, Russell is not entitled to any relief.
" 'To find plain error in the context of a Batson or J.E.B. violation, the record must supply an inference that the prosecutor was "engaged in the practice of purposeful discrimination.' " Blackmon v. State, 7 So.3d 397, 425 (Ala. Crim. App. 2005) (quoting Ex parte Watkins, 509 So.2d 1074, 1076 (Ala. 1987) ). See also Saunders v. State, 10 So.3d 53, 78 (Ala. Crim. App. 2007) ('For an appellate court to find plain error in the Batson [or J.E.B. ] context, the court must find that the record raises an inference of purposeful discrimination by the State in the exercise of peremptory challenges.').
"In evaluating a Batson or J.E.B. claim, a three-step process must be followed. As explained by the United States Supreme Court in Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed. 2d 931 (2003) :
" 'First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. [Batson v. Kentucky,] 476 U.S. [79,] 96-97[, 106 S.Ct. 1712, 1723 (1986) ]. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Id., at 97-98, 106 S.Ct. 1712. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination. Id., at 98, 106 S.Ct. 1712.'
" 537 U.S. at 328-29, 123 S.Ct. 1029.
"With respect to the first step of the process-the step at issue here-'[t]he party alleging discriminatory use of a peremptory strike bears the burden of establishing a prima facie case of discrimination.' Ex parte Brooks, 695 So.2d 184, 190 (Ala. 1997) (citing Ex parte Branch, 526 So.2d 609, 622 (Ala. 1987) ). 'A defendant makes out a prima facie case of discriminatory jury selection by "the totality of the relevant facts" surrounding a prosecutor's conduct during the defendant's trial.' Lewis v. State, 24 So.3d 480, 489 (Ala. Crim. App. 2006) (quoting Batson, 476 U.S. at 94, 106 S.Ct. 1712, aff'd, 24 So.3d 540 (Ala. 2009). 'In determining whether there is a prima facie case, the court is to consider "all relevant circumstances" which could lead to an inference of discrimination.' Ex parte Branch, 526 So.2d at 622 (citing Batson, 476 U.S. at 93, 106 S.Ct. 1712, citing in turn Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed. 2d 597 (1976) ). In Ex parte Branch, the Alabama Supreme Court specifically set forth a number of 'relevant circumstances' to consider in determining whether a prima facie case of race discrimination has been established:
" 'The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
" '1. Evidence that the "jurors in question share[d] only this one characteristic-their membership in the group-and that in all other respects they [were] as heterogeneous as the community as a whole." [People v.] Wheeler, 22 Cal.3d [258] at 280, 148 Cal.Rptr. [890] at 905, 583 P.2d [748] at 764 [ (1978) ]. For instance, "it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions," Wheeler, 22 Cal.3d at 280, 148 Cal.Rptr. at 905, n.27, 583 P.2d at 764, indicating that race was the deciding factor.
" '2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges *1154 were used to strike black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723.
" '3. The past conduct of the state's attorney in using peremptory challenges to strike all blacks from the jury venire. Swain [v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed. 2d 759 (1965) ].
" '4. The type and manner of the state's attorney's questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723 ; Wheeler, 22 Cal. 3d at 281, 148 Cal.Rptr. at 905, 583 P.2d at 764.
" '5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355 (Fla. Dist. Ct. App. 1987) ; People v. Turner, 42 Cal.3d 711, 230 Cal.Rptr. 656, 726 P.2d 102 (1986) ; People v. Wheeler, 22 Cal. 3d 258, 148 Cal.Rptr. 890, 583 P.2d 748, 764 (1978).
" '6. Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, 503 So.2d at 355.
" '7. Disparate examination of members of the venire; e.g., in Slappy, a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
" '8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721 ; Washington v. Davis, 426 U.S. [229] at 242, 96 S.Ct. [2040] at 2049, 48 L.Ed.2d 597 [ (1976) ].
" '9. The state used peremptory challenges to dismiss all or most black jurors. See Slappy, 503 So.2d at 354, Turner, supra.'
" Id. at 622-23."
White, 179 So.3d at 198.
Here, after a number of veniremembers were disqualified, excused, deferred, or stricken for cause, 81 qualified veniremembers remained-61 were Caucasian, 17 were African American, and 2 were Hispanic.[11] Therefore, the 17 African-American veniremembers constituted 21% of the venire. The State used 11 of its 34 peremptory strikes to remove African-American veniremembers. Russell used 2 of his 33 peremptory strikes to remove African-American veniremembers. Russell's jury consisted of 4 African-American jurors and 8 Caucasian jurors.[12] Therefore, the 4 African-American jurors comprised 33.33% of Russell's jury. At the conclusion of voir dire, Russell's defense counsel did not indicate, and the circuit court did not believe, that a Batson violation had occurred. The circuit court asked: "Do we have any issues or anything we need to take up before I seat the jury?" and Russell's counsel responded: "Not from the defense."
*1155 On appeal, Russell claims for the first time that the State's use of peremptory strikes established a prima facie case of discrimination against the African-American veniremembers. Specifically, Russell argues: (1) that the State removed a disproportionate number of African-American veniremembers compared to Caucasian veniremembers; (2) that the African-American veniremembers removed by the State were heterogeneous to the community as a whole; and (3) that the State completely failed to question 6 of the 11 African-American veniremembers it ultimately struck.
We disagree with Russell's argument that the statistical evidence supports his claim of a prima facie case of racial discrimination. As noted above, the African-American veniremembers constituted 21% of the venire, and, after the State exercised its peremptory strikes, African-American jurors constituted 33.33% of the final jury. Although the State used 11 peremptory strikes to remove 11 of the 17 African-Americans remaining on the venire after excusals and challenges for cause, this fact does not establish a prima face case of racial discrimination. See Johnson v. State, 823 So.2d 1 (Ala. Crim. App. 2001) (State's use of 6 peremptory strikes to remove 6 of 9 African-American veniremembers insufficient to establish a prima facie case of racial discrimination); Scheuing v. State, 161 So.3d 245, 260 (Ala. Crim. App. 2003) ("Here, the State's use of peremptory strikes to remove 8 of 12 African-American veniremembers does not raise an inference of racial discrimination.").
Moreover, we disagree with Russell's argument that the diversity of the stricken African-American veniremembers supports his claim of a prima facie case of racial discrimination.
"[T]here is almost always going to be some variance among prospective jurors who are struck; therefore, this alone does not establish heterogeneity of the struck veniremembers so as to support an inference of discrimination. The question, as noted in both Ex parte Branch [, 526 So.2d 609 (Ala. 1987),] and Ex parte Trawick, [698 So.2d 162 (Ala. 1997) ] is whether the struck jurors shared only the characteristic at issue, in this case, [race]. The record here does not reflect that the [African-American veniremembers] struck shared only the characteristic of [race]. To the contrary, the record reflects that many of the [African-American veniremembers] shared similar characteristics other than [race]."
McCray v. State, 88 So.3d 1, 20 (Ala. Crim. App. 2010).
For example, seven of the African-Americans struck stated that they or a family member had been charged with a criminal offense; five indicated that they or a family member had been a victim of a crime; three indicated that they had an unpleasant experience involving law enforcement; two had served on a criminal jury before; seven indicated that they watched television shows that focused on criminal cases; seven indicated that they attended religious services on a regular basis; and eight identified themselves as Democrats.[13] Based on these facts, the African American veniremembers struck by the State in this case were not heterogeneous in all respects but race; therefore, this factor does not support an inference of discrimination.
Finally, Russell's claim that the State completely failed to question 6 of the 11 African-American veniremembers who were stricken is refuted by the record.
*1156 Although Russell is correct that potential jurors C.B., V.H., J.D., C.W., E.J., and R.K. answered no questions during voir dire, the record reflects that several other veniremembers who were ultimately struck and most of the final jurors also answered no questions during voir dire. Moreover, the record contains 10-page jury questionnaires asking several different questions that veniremembers returned to the trial court before they appeared at voir dire. Both the State and Russell's defense counsel received the jury questionnaires in advance of voir dire and had the opportunity to examine the veniremembers' responses before conducting voir dire. Each party's voir dire with respect to individual questioning was limited; the questions focused on the veniremembers' abilities to remain unbiased and to follow the trial court's orders, veniremembers' beliefs with respect to the death penalty, veniremembers' relationships to law-enforcement officers, and veniremembers' attitudes toward firearms. Under these circumstances, we do not find that the State's striking six African-American veniremembers who answered no questions during voir dire supports an inference of racial discrimination. For the foregoing reasons, we find no error, much less plain error, with respect to Russell's Batson claim.
II.
Russell contends that the trial court erred when it denied his motion to suppress his video-recorded statement to police.[14] Russell claims that the totality of the circumstances of August 24, 2011-specifically, he says, sleep deprivation and the effects of smoking synthetic marijuana, hiding in a drain pipe for seven to eight hours after the shooting, and being "subjected to physical violence and threats by police" during and after his arrest-left him "unable to make an informed decision to waive his Miranda [15 ] rights, rendering his statements involuntary and inadmissible." (Russell's brief, p. 85-86.)
On April 29, 2013, Russell filed a motion to suppress his statement, claiming that he "was not effectively advised of his constitutional rights"; that "he was not informed of the charge pending against him"; that he "did not have counsel and was not afforded the opportunity to retain counsel prior to being interviewed"; that he "was not in a mental or physical condition that he could have been interviewed"; that he "could not have knowingly, intelligently and voluntarily waived his constitutional right to remain silent, and his statements were not voluntarily given"; and that his statements should be excluded under Rules 401, 402, 403, 404(a) and (b), 801(c), and 802, Ala. R. Evid. (C. 132.) Russell further argued that, if the trial court found his statements to be admissible, "the video of [his] statements must be redacted" because, he said, "[t]here are portions of the video that are inflammatory, prejudicial, irrelevant and contain inadmissible hearsay," and he requested "to review the redacted statements to determine whether the redacted statements contain any objectionable parts before the State should be allowed to play the video for the jury." (C. 133.)
The record includes a waiver-of-rights form signed by Russell at 7:00 P.M. on August 24, 2011. The form informed Russell that he had the right to remain silent, the right to speak with a lawyer before being questioned, and the right to have a lawyer present during questioning. The form further stated that anything Russell said could and would be used against him in a court of law; that, if he decided to *1157 answer questions, he had the right to stop answering at any time; and that, if he could not afford a lawyer, one would be appointed to represent him before questioning if he so desired. Russell signed the form below a statement that reads:
"I have read the statement of my rights and I understand what my rights are. I am willing to answer questions at this time. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."
(C. 430.)
Russell's video-recorded statement shows that Sgt. Sparks briefly entered the interview room to inform Russell that, at the time Russell was interviewed, he was being charged with attempted murder. While waiting to be interviewed, Russell asked the officer sitting in the room with him if he could telephone his family, to which the officer replied: "Not right now." Without being questioned, Russell said: "Damn weak ass police officers goin' try to jump on me after I'm in handcuffs." The video does not indicate that Russell was suffering from any obvious physical injuries.
When Sgt. Sparks and Inv. Suits entered the room to conduct the interview, they provided Russell with water, helped him adjust his clothing, and wiped grass and leaves from his hair and face. Before beginning the interview, Sgt. Sparks told Russell:
"What we're going to do, we're going to talk about everything that's happened. I know you've been in a bad place all day long. Listen, I want to help you through this.
"....
"You need someone in your corner right now. That's our job. We're here for whoever comes in here and talks to us, and we want to help you get through this. I know you've had a bad day. I've had a bad day. I know you're tired. We're all tired."
(State's Exhibit 29.) Sgt. Sparks asked Russell if he had ever been informed of his Miranda rights, and Russell nodded yes. Sgt. Sparks told Russell to stop him if he had any questions, and Sgt. Sparks then read the waiver-of-rights form to Russell. Sgt. Sparks asked Russell if he understood those rights, and Russell nodded. Sgt. Sparks then showed Russell the waiver-of-rights form and explained that the form was an acknowledgment that Russell was willing to talk to police officers at that time. Sgt. Sparks read aloud the statements from the waiver-of-rights form as quoted above, and when asked if he understood, Russell nodded and said "Yes." Sgt. Sparks asked Russell if he wanted to talk to him, and Russell nodded yes and signed the waiver-of-rights form.
During the interview, Russell fidgeted constantly, yawned several times, and indicated that he wanted to bathe, to change into clean clothes, and to sleep. Russell, however, was able to coherently answer Sgt. Sparks' questions and to relate the details of the stop, the foot chase, the shooting, and his attempt to evade capture. At no time during the interview did Russell request to speak with an attorney or refuse to answer questions.
On August 14, 2013, the trial court held a pretrial status conference during which the parties discussed Russell's motion to suppress. The court did not conduct a hearing, and neither party presented witnesses or other evidence aside from Russell's statement itself. Russell agreed to the admission of the video-recorded statement on the condition that it be redacted to remove portions that showed: officers bringing Russell into the interview room and his "interaction with the police" at that time; Russell placing a baggie of what was *1158 presumably marijuana into his mouth; and any references to Russell's past criminal activity and past contact with the police. Following the hearing, the trial court issued a written order stating that Russell's statement "shall be edited or redacted in the form as set out in the hearing." (C. 165.)
On the morning before the third day of trial, the State brought to the court's attention Russell's objection to the redacted version of his statement:
"[The State]: This morning Mr. Moeller [prosecutor] brought it in to play. Apparently-I was not privy to this conversation-[he] ask[ed] the defense if they had any problems with the redacted video and didn't get an answer to my satisfaction. I think this question was we don't know whether we do or we may have an issue. My concern is I want to be confident that what I play with the Court's instruction to the jury about redaction and obvious issues where when you redact there's a slight lag time, longer in the tape, you know, where the voice and things don't match. That we then don't have an issue where something pops out in front of the jury and a bell has been rung that I can't unring. If there is an objection, I'd like to hear it now so that we can fight about it and if it has to be further redacted, we can get it done. That process takes at least an hour to redact. So, I'm kind of running out of time. I'm not trying to put anybody on the spot but I kind of am. Because we have-it's obviously coming and I'd like to have it come in a form that's as clean as possible.
"[Defense counsel]: It's simply this: We got the redaction yesterday. We couldn't look at it until last night. There is something in there that we feel that was part of our discussions early on, ruling to take certain things out. It refers to a prior incident of which the defendant indicated that he did this on a prior occasion and got away. We discussed that at several of the hearings we had addressing the statement and we were under the impression that the Court ruled that was to be taken out. That's in. I mean, that one issue. It's not a long-it's not a, you know, basically briefly a few seconds, right, Jen [defense counsel]? Just a few seconds where he says that. He really don't (sic) go into it any further than he said it and really just moves on. But at least kind of raises the question of, you know, that he goes around pointing guns at a police officer. That's not the case. That's not the case. There's not a prior incident of him pointing a gun at a police officer.
"[The State]: [Defense counsel], we talking about where he pointed a cell phone at Officer Husk?
"[Defense counsel]: Yeah.
"[The State]: When he said he tried to scare an officer before?
"[Defense counsel]: Yeah.
"[The State]: We had already had a hearing on that issue. I think the Court, again, especially now in light of the defense, the Court ruled that was admissible because he says, 'I was attempting to scare the officer previously. I was doing the same thing in this case.'
"The defense is: 'I didn't intend to kill.' The-he as part of his statement puts that out there. We didn't redact that and the Court said it stays in at the hearing. That's my recollection. Because he puts in as part of his discussion as to why he would do this. On a previous occasion, he had pulled a cell phone, pointed it at the officer and the officer had run away. So he was just trying to scare him. And that was consistent with his statements throughout.
"So we've taken out all the things the Court asked us to regarding prior criminal contact, warrants out of Oxford and *1159 all that stuff. I didn't know what the issue was. That part, my understanding was to be left in because it goes to his mental state and res gestae. He was intending to scare. His excuse to the police that 'I've done it before' obviously should be admissible.
"THE COURT: And we may have discussed this and-[defense counsel], I'm not trying your case, but it sounds like it's a-it works both ways. I mean, if he's saying this was an accident that he pulled the gun to scare Officer Sollohub just like he had in the past, but something unfortunate went on or gun went off or whatever. I'm leaving it in if it goes to mental operation of him and his state of mind. All those things that he had done previously. I mean, I see where it can serve either side. And I'm leaving it in and it's his own statement. And something he put in the statement. I don't know that it was ever asked directly of him.
"[Defense counsel]: It wasn't. They didn't question him about it. He brought it up. And that was the only-that was the issue that we had and Jen [defense counsel] and I debated it and her and I had some heated discussions about it."
(R. 862-67.)
During Sgt. Sparks's testimony on direct examination, the State introduced Russell's redacted video-recorded statement to police, and the statement was played for the jury. After admitting the statement, the court noted Russell's "earlier objection mentioned outside."
"In reviewing a trial court's ruling on a motion to suppress a confession or an inculpatory statement, this Court applies the standard discussed by the Alabama Supreme Court in McLeod v. State, 718 So.2d 727 (Ala. 1998) :
" 'For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala. 1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court's determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala. Crim. App. 1984)....
" 'The Fifth Amendment to the Constitution of the United States provides in pertinent part: "No person ... shall be compelled in any criminal case to be a witness against himself...." Similarly, § 6 of the Alabama Constitution of 1901 provides that "in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself." These constitutional guarantees ensure that no involuntary confession, or other inculpatory statement, is admissible to convict the accused of a criminal offense. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed. 2d 1037 (1961) ; Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968).
" 'It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, "if his will has been overborne" by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
*1160 " 'The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the "totality of the circumstances." Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed. 2d 433 (1969) : Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed. 2d 77 (1968) ; see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed. 2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed. 2d 872 (1992) ; Jackson v. State, 562 So.2d 1373, 1380 (Ala. Crim. App. 1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala. Crim. App. 1978) (stating that the true test to be employed is "whether the defendant's will was overborne at the time he confessed")(emphasis added).'
" 718 So.2d at 729 (footnote omitted)."
Osgood v. State, [Ms. CR-13-1416, October 21, 2016] --- So.3d ----, ---- (Ala. Crim. App. 2016).
"[T]he test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by 'apprehension of harm or hope of favor.' See [Ex parte] Gaddy, 698 So.2d [1150,] 1154 [ (Ala. 1997) ] (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala. 1988) ); Culombe, 367 U.S. at 602, 81 S.Ct. at 1879 ; Jackson, 562 So.2d at 1380. To determine if a defendant's will has been overborne, we must assess 'the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; '[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are facts to be considered in determining [the defendant's] susceptibility to police pressures.' Jackson, 562 So.2d at 1380-81 (citations omitted)."
McLeod, 718 So.2d at 730.
" ' "The question of whether a confession was voluntary is initially to be determined by the trial court." ' Minor v. State, 914 So.2d 372, 388 (Ala. Crim. App. 2004), quoting Jackson v. State, 562 So.2d 1373, 1381 (Ala. Crim. App. 1990).... ' "In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court." ' Kennedy v. State, 640 So.2d 22, 26 (Ala. Crim. App. 1993), quoting Bradley v. State, 494 So.2d 750, 761 (Ala. Crim. App. 1985), aff'd, 494 So.2d 772 (Ala. 1986).
Eggers v. State, 914 So.2d 883, 899 (Ala. Crim. App. 2004).
Here, there was no hearing on Russell's motion to suppress. The only evidence before the trial court was Russell's video-recorded statement, which was redacted after the court and the parties watched the recording in its entirety. We note, however, that this Court may consider evidence adduced at trial when reviewing a trial court's ruling on a motion to suppress. See Smith v. State, 795 So.2d 788 (Ala. Crim. App. 2000) (quoting Henry v. State, 468 So.2d 896 (Ala. Crim. App. 1984) ). At trial, Sgt. Sparks testified that *1161 he interviewed Russell beginning at 7 P.M. on August 24, 2011. Sgt. Sparks testified that he advised Russell of his Miranda rights and that Russell signed a waiver-of-rights form in his presence. As noted above, that form is included in the record. In addition, the record indicates that Russell had prior experience with the criminal-justice system. After reviewing the video-recording of Russell's statement, which corroborates Sgt. Sparks's testimony, we cannot say that the trial court abused its discretion when it denied Russell's motion to suppress. Accordingly, Russell is not entitled to relief on this issue.
We further note that Russell's objection at trial to evidence that he once scared a police officer using a cellular telephone was the basis of his argument against the admission of the recording, but on appeal he does not raise this issue as part of his challenge to the denial of his motion to suppress. Russell does, however, challenge the trial court's failure to sua sponte issue a limiting instruction regarding collateral-bad-acts evidence, and he attacks references to his statement regarding the cellular telephone in that argument. Therefore, we address that specific issue in Section VII.
III.
Russell contends that the trial court erred when it allowed the State to introduce victim-impact evidence during the guilt phase of his trial because, he says, such evidence "was not relevant to any issues before the jury and likely interfered with the jury's objective evaluation of the evidence."[16] (Russell's brief, p. 91.) Further, Russell argues that certain statements the prosecutor made during opening and closing arguments emphasized the victim-impact evidence and "encouraged the jury to consider the evidence for improper purposes." (Russell's brief, p. 90.)
" ' "It is well settled that victim-impact statements 'are admissible during the guilt phase of a criminal trial only if the statements are relevant to a material issue of the guilt phase. Testimony that has no probative value on any material question of fact or inquiry is inadmissible.' Ex parte Crymes, 630 So.2d 125, 126 (Ala. 1993), citing Charles W. Gamble, McElroy's Alabama Evidence, § 21.01 94th ed. 1991). However, 'when, after considering the record as a whole, the reviewing court is convinced that the jury's verdict was based on the overwhelming evidence of guilt and was not based on any prejudice that might have been engendered by the improper victim-impact testimony, the admission of such testimony is harmless error.' Crymes, 630 So.2d at 126.
" ' Jackson v. State, 791 So.2d 979, 1011 (Ala. Crim. App. 2000).'
" Gissendanner v. State, 949 So.2d 956, 965 (Ala. Crim. App. 2006). '[T]he introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law.' Ex parte Rieber, 663 So.2d 999, 1006 (Ala. 1995). However, 'a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.' Id. at 1005."
Shanklin v. State, 187 So.3d 734, 781 (Ala. Crim. App. 2014).
*1162 A. Organ-Donation Testimony
Russell argues that testimony regarding Officer Sollohub's organ donation was improper victim-impact testimony presented during the guilt phase of his trial.
At a pretrial hearing, Russell moved to exclude evidence "that Officer Sollohub donated his organs" because, he argued, such evidence was not relevant and "that kind of testimony just kind of plays to the passions and sympathy of the jurors." The trial court offered to issue a limiting instruction to the jurors "that they're not to make their ruling base[d] on bias, prejudice, sympathy, compassion, emotion, and all that." The court further instructed the State to limit the testimony to the fact that Officer Sollohub had donated his organs and not to "go into any great detail about this or anything."
When asked whether she knew about Officer Sollohub's organ donation, Dr. Sherry Melton of UAB Hospital testified:
"When someone is pronounced brain dead and their apnea test is completed, they're left on the ventilator, and they're on life support even though they've been pronounced brain dead. And then Alabama Organ Center is consulted, and they go to family and pursue, 'Did the person want to give that gift?' And that happened in this case."
(R. 848.)
Calhoun County Coroner Patrick Brown testified that "there was a decision made for organ donation" and that he "witnessed the actual procurement" of Officer Sollohub's organs. Following the conclusion of Coroner Brown's testimony, Russell renewed his objection to evidence of Officer Sollohub's organ donation, and the trial court overruled his objection.
Dr. Ward subsequently testified:
"A. We received the body from-it was identified by Coroner Pat Brown. The body came to us from UAB after having been pronounced dead at UAB and having organ procurement for transplant.
"Q. And the issue of organ procurement, you were consulted in regards to that; is that correct?
"A. Yes, I was.
"Q. And it was based on your opinion and your decision that would be acceptable if that occurred; is that right?
"A. Yes, ma'am.
"Q. That would not have an affect on your ability to perform an autopsy and arrive at a cause/manner of death?
"A. That's correct."
(R. 978.) Dr. Ward further testified that Officer Sollohub "had an incision where they had taken his organs that they were going to use for transplant. Because of that procedure-that transplant procedure, he also had a tube in his mouth that went into his throat." Dr. Ward again testified, "You can see that incision going from the top of his neck to his abdomen area, where the organs were procured. That incision made by the transplant doctors/surgeons."
We agree with the State that the above statements were not victim-impact testimony. " 'Victim-impact statements typically "describe the effect of the crime on the victim and his family." ' " Townes v. State, 253 So.3d 447, 474 (Ala. Crim. App. 2015) (opinion on return to remand)(quoting Turner v. State, 924 So.2d 737, 770 (Ala. Crim. App. 2002) )(quoting, in turn, Payne v. Tennessee, 501 U.S. 808, 821, 111 S.Ct. 2597, 115 L.Ed. 2d 720 (1991) ). Testimony with respect to Officer Sollohub's organ donation did not describe the effect of the crime on Officer Sollohub or his family. Moreover, after a review of the record, it is apparent that the State introduced such evidence in a limited context for the purposes of establishing the chain-of-custody for Officer Sollohub's body and of explaining *1163 the effect of the organ donation upon Officer Sollohub's autopsy.[17] Accordingly, Russell's claim is without merit, and he is not entitled to relief on this issue.
B. Jennifer Morris's Testimony
Russell argues that the State introduced improper victim-impact evidence in the form of Jennifer Morris's[18] testimony and a close-up photograph[19] of Officer Sollohub that was introduced during Morris's testimony.
Russell challenges the following testimony from Morris with regard to Officer Sollohub:
"Q. Tell us about your son, Justin Sollohub.
"A. The best description is he was just so full of life. He lived life so big. He was born on Valentine's Day, my first baby, and he was always my baby.
"Q. A big boy?
"A. He was a big guy.
"Q. Still your baby?
"A. Yes. One time I got a new cell phone, and I had all the kids record a ring tone for me so when they called me that I would know it was them, and his said, 'Hey, mom, it's your baby boy, pick up the phone, I'm calling.'
"Q. Tell us about Justin's growing up and going to school. What area did he grow up in, and did y'all move around any and where did he go to school?
"A. We moved to Alabama-
"[Defense counsel]: Judge, no disrespect, but may we approach the bench?
"THE COURT: Sure.
"(Whereupon, an off-the-record discussion was held at the bench with both counsel present and the Court.)
"Q. (By [the State] ) All right.
"....
"What did he choose to do for a living?
"A. He wanted to be a police officer from the time he was in second grade. I found the letter he wrote in second grade.
"....
"Q. All right. Tell me how you found out that your son, the last time you saw him was living, was no longer with us.
"A. I was at work about ten blocks from where it happened, and I heard the sirens. I heard the ambulance, and my husband was on duty. He was also a police officer, and he got a call from his nephew who worked at the courthouse who said Justin had been hurt and we needed to get to the hospital. And when I called the police department, nobody could talk to me, so I got to the hospital and found him.
"Q. So the last time you had seen him, did he have injuries of that kind?
"A. I saw him the night before, and he was fine. He was full of life.
*1164 "Q. Okay. And after he was shot, how long did he stay with us until he ultimately passed away?
"A. He was gone already when I saw him, but he was taken off life support the following day.
"Q. Okay. And you had to go to UAB to sit with him as he passed?
"A. Yes.
"Q. I'm going to have you look at a photograph that I've marked as State's-
"A. And I had to call his siblings and tell them what happened to him. He has a brother and a sister still here, and that was the worst part.
"(Whereupon, State's Exhibit No. 1-A was marked for identification.)
"Q. (By [the State] ): Let me show you what I've marked at State's Exhibit 1-A. And can you tell me if you recognize what that is?
"A. That's Justin with his smile.
"Q. And can you tell me the context of that photo? I believe you're the one that gave it to us. Do you remember where that was taken or anything about that photograph?
"A. No.
"Q. Just the smile?
"A. Just his smile.
"[The State]: Judge, I'd move to admit State's Exhibit 1-A.
"THE COURT: 1-A will be admitted.
"(Whereupon, State's Exhibit 1-A was admitted into evidence.)
"[The State]: May I publish?
"THE COURT: You may.
"Q. (By [the State] ): That's your baby boy as you knew him when he was alive?
"A. Yes.
"Q. And now he's been taken from you?
"A. Yes."
(R. 527-31.)
Initially, we question whether Russell timely objected to this evidence. During Morris's testimony, Russell requested to approach the bench, and the parties engaged in an off-the-record discussion. During a recess in the trial after the conclusion of Morris's testimony, the following discussion occurred:
"[Defense counsel]: Judge, I just want to make sure that this got on the record. We had an objection to the State going-soliciting testimony from Justin Sollohub's mother, kind of going into a day in the life and wanted to kind of go into background information.
"We made an objection on that based upon relevance and [Rule] 403, [Ala. R. Evid.,] and the Judge-the Court, I understood, overruled that in a lending situation. Say, renew if it goes too far, it continues, you can renew that objection. I just wanted to make sure that we got that objection on the record that we-that it was not admissible to kind of go into that day in the life of Justin Sollohub. So we had it at the sidebar, and I'm not sure she can hear everything.
"THE COURT: She could not, and that's fine. You're correct. You had made the objection. I did overrule it; however, after that, [the State]-I told you, you felt free to re-bring that up again if you felt like you needed to impose it, and I think after that he just asked simple questions about where he went to school and where he went to police academy, I think it was.
"[Defense counsel]: But I just want to make sure when we take breaks that we get any objection on the record.
"(Whereupon, a short recess was taken.)"
(R. 577-78.)
"In order for this court to review an alleged erroneous admission of *1165 evidence, a timely objection must be made to the introduction of the evidence, specific grounds for the objection should be stated and a ruling on the objection must be made by the trial court." Goodson v. State, 540 So.2d 789, 791 (Ala. Crim. App. 1988), abrogated on other grounds recognized by Craig v. State, 719 So.2d 274 (Ala. Crim. App. 1998). "When a timely objection at the time of the admission of the evidence is not made, the issue is not preserved for this Court's review." Ziglar v. State, 629 So.2d 43, 47 (Ala. Crim. App. 1993).
"If counsel makes objections and secures rulings 'off the record,' this court cannot consider those rulings. If the trial court hears objections and makes rulings in side-bar conferences only, then the court reporter must be a party to the side-bar conference if the actions of counsel are to be recorded. Our review is limited to matters of record."
Jefferson v. State, 449 So.2d 1280, 1282 (Ala. Crim. App. 1984).
Regardless, Russell's claims are without merit. "Alabama courts have often stated that a trial court has substantial discretion in determining whether evidence is admissible and that a trial court's decision will not be reversed unless its determination constitutes a clear abuse of discretion. E.g., Ex parte Loggins, 771 So.2d 1093, 1103 (Ala. 2000)." Hosch v. State, 155 So.3d 1048, 1081 (Ala. Crim. App. 2013).
With respect to introducing photographs of homicide victims, this Court has stated:
" 'In Jolly [v. State, 395 So.2d 1135 (Ala. Crim. App. 1981) ], citing McElroy's Alabama Evidence, this court held:
" ' " 'It generally is agreed that the photograph of the victim of the homicide, taken before the alleged murder, is admissible for the purpose of identification. This is usually admitted in connection with the testimony of a witness who saw the alleged deceased at the time of the killing and who is called upon to identify the deceased as the person in the photograph. The foregoing decisions which admit the victim's photograph into evidence for the purpose of identification are applicable even though there exists no dispute over the identity of the deceased. (Citing Luschen v. State, 51 Ala.App. 255, 284 So.2d 282 (1973) (not error to introduce "angelic" looking picture of deceased); Boyd v. State, 50 Ala.App. 394, 279 So.2d 565 (1973) ; Sanders v. State, 202 [Ala.App.] 37, 202 Ala. 37, 79 So. 375 (1918) ).'
" ' 395 So.2d at 1142.' "
McMillan v. State, 139 So.3d 184, 226-27 (Ala. Crim. App. 2010) (quoting Burgess v. State, 827 So.2d 134, 187 (Ala. Crim. App. 1998), aff'd, 827 So.2d 193 (Ala. 2000), cert. denied, 537 U.S. 976, 123 S.Ct. 468, 154 L.Ed. 2d 335 (2002) ). The State introduced the photograph of Officer Sollohub for the purpose of identification. Therefore, we cannot say that the trial court abused its discretion when it admitted the photograph.
Moreover, we do not agree with Russell's characterization of Morris's testimony as describing "her relationship with her son" or "how emotionally difficult it had been for her to learn that he had been shot." (Russell's brief, p. 88.) Instead, we agree with the State that Morris's testimony did not describe the effect Officer Sollohub's death had upon her and, therefore, was not victim-impact evidence. See Townes, supra.
To the extent that Morris's testimony-which was nonresponsive to the prosecutor's question-that informing Officer Sollohub's siblings of his death was "the worst part" was victim-impact evidence, we find that any error in its admission was harmless. Given the evidence presented at trial, we conclude that Morris's *1166 testimony did not affect the outcome of the trial or otherwise prejudice a substantial right of Russell's. See Ex parte Crymes, 630 So.2d 125 (Ala. 1993). Accordingly, we find no plain error here, and Russell is not entitled to relief on this issue.
C. Tyler Gilley's Testimony
Russell argues that the State elicited improper impact evidence during Tyler Gilley's testimony. Russell challenges the following testimony:
"Q. And at some point in time, did it come to your attention who the officer was that had gotten shot?
"[Defense counsel]: Judge, we object. That's not relevant to her. It's not relevant.
"THE COURT: Okay. I'm going to allow her leeway on this question. We'll see what the next question is.
"[The State]: Did you know the officer, Justin Sollohub?
"A. Yes.
"Q. And how did you know Officer Sollohub?
"A. We worked together. That was my work boyfriend, as I would call him. We were very close.
"Q. So y'all had worked together at Piggly Wiggly?
"A. Yes, ma'am."
(R. 1234-35.)
Again, we do not agree with Russell's characterization of the above-quoted testimony as victim-impact evidence because it did not describe the effect that Officer Sollohub's death had on Tyler. See Townes, supra. Accordingly, Russell's claim is without merit, and he is not entitled to relief on this issue.
D. Prosecutor's Statements
Russell argues that the following statements by the prosecutor improperly emphasized the victim-impact evidence:
• "For Jennifer Morris, it's about a lifetime. She had a son, and now she has a memory."
• "[Tyler Gilley] said Justin Sollohub was like her work boyfriend."
• "It's a tragedy for Jennifer Morris. She'll never have a grandchild by her son. She'll never have the joy of going shopping with her daughter-in-law. It's all been taken from her."
• "What kind of person decides at a very young age that they want to be a law-enforcement officer? They want to put a gun on every day and they want to go out and they want to be that protective barrier between citizens and the criminal element? What kind of person decides that? Justin Sollohub decides that. Young man decides that's what he wants to do in life. His mother finds a letter that he wrote in second grade saying that's what he wants to be." (R. 1656-57.)
Russell did not object to these statements at trial; therefore, we review this issue for plain error only. See Rule 45A, Ala. R. App. P.
This Court addressed a substantially similar issue in Jackson v. State, 791 So.2d 979, 1012-13 (Ala. Crim. App. 2000) :
"The standard for reviewing a prosecutor's argument is whether the argument 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed. 2d 144 (1986). " ' "This court has concluded that the failure to object to improper prosecutorial arguments, [as is the case here,] ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be *1167 particularly harmful." ' Kuenzel v. State, 577 So.2d 474, 489 (Ala. Cr. App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed. 2d 197 (1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n.6 (11th Cir. 1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed. 2d 152 (1987). Furthermore:
" ' "In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala. Cr. App. 1987) ; Wysinger v. State, 448 So.2d 435, 438 (Ala. Cr. App. 1983) ; Carpenter v. State, 404 So.2d 89, 97 (Ala. Cr. App. 1980), cert. denied, 404 So.2d 100 (Ala. 1981). Moreover, this court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala. Cr. App. 1984) ; Sanders v. State, 426 So.2d 497, 509 (Ala. Cr. App. 1982)." '
" Hutcherson v. State, 727 So.2d 846, 854-55 (Ala. Cr. App. 1997), aff'd, 727 So.2d 861 (Ala. 1998), aff'd. in pertinent part, remanded on other grounds, 585 So.2d 112, 127 (Ala. 1991), aff'd. on return to remand, 625 So.2d 1141 (Ala. Cr. App. 1992), rev'd on other grounds, 625 So.2d 1146 (Ala. 1993)."
"We do not find that the prosecutor's comments, either alone or in conjunction with his other comments, were reversible error. The evidence of [Russell]'s guilt ... was compelling. The jury was properly instructed that it should base its verdict solely on the evidence in the case; that the statements and arguments of the attorneys were not to be considered as evidence; and that its verdict could not be based on sympathy, prejudice, or emotion. ' "The jury is presumed to follow the instructions given by the trial court." ' Frazier v. State, 758 So.2d 577, 604 (Ala. Cr. App. 1999), aff'd, 758 So.2d 611 (Ala. 1999), quoting Hutcherson, supra, at 854,. Viewed in the context of the entire trial, we do not believe that the prosecutor's comments during opening or closing arguments about the victim affected the outcome of [Russell]'s trial or otherwise prejudiced [Russell]. Accordingly, we find no reversible error regarding this claim.
791 So.2d at 1012-13.
IV.
Russell contends that the trial court erred when it allowed Dr. Ward, over Russell's objection, to testify with respect to the positions of Russell and Officer Sollohub when Russell fired the gun.[20] Specifically, Russell claims that Dr. Ward's testimony "impermissibly drew conclusions for the jury," "directly undermined [his] defense ... that the gun was fired unintentionally," and improperly bolstered what he says was "unreliable and conflicting witness testimony" from Karen Mason and her son, Justin Beard. (Russell's brief, p. 53.)
With respect to this issue, Dr. Ward testified as follows:
"Q. And the stippling as you noted and you say it is around the wound. Does the stippling also help you determine whether or not that may have been at an angle? Is it something to do with symmetrics regarding the stippling?
"A. Yes. Yes.
*1168 "Q. And what is significance of symmetrics in this case?
"A. If the bullet had been traveling at an angle or the gun was not pointing directly at his head-
"[Defense counsel]: Judge, we object to all those kind of conclusions. She's not an expert in ballistics or firearms. She's an expert in cause of death. She's trying-we object to going-not an expert in this field. We object to that. I don't mean to make a speaking-
"THE COURT: I'll sustain as far as her drawing any conclusions or testifying about firearms. But as far as what she has observed of the wound and the conclusion, she can draw as it relates to that. But the field in which she's an expert in pathology, she's allowed to do that. I think she's already answered you. She testified to the question that you re-asked. So, I mean, you can ask something again or move on, either way.
"....
"Q. And based on your observations of the wound and your attempt to position his head at the time of the wound itself as it was caused as to direction of travel and fact it's circular-and I believe you note that it is two inches from the top of the head and three inches to the left of the midline. Two inches from the top of the head, would that be consistent with the head being in a slightly downward position?
"[Defense counsel]: Judge, we object to testifying as to position of bodies. She's not an eyewitness.
"THE COURT: Sustained.
"[The State]: Your Honor, I believe she can testify as to body positioning itself, not placement of parties. Those are two different things. I'm not asking her to place parties. I'm asking her to tell us based on her expert opinion, the positioning of the head.
"THE COURT: But can she answer that without knowing the position of the firearm that produced the projectile.
"[The State]: She's testified that it is in a left to right downward path which is part of the trajectory. That she can testify to. Also, she can testify to placement or positioning of the head. It is consistent with being in a downward position. She can testify to that.
"[Defense counsel]: She is trying to position the party. She can testify to the track of the bullet to which she already did.
"[The State]: It's not positioning of the parties, Your Honor. Positioning of the parties is A standing in this place and B standing in this place when weapon is fired. That is placement of party. Body positioning is different and she has previously testified that she can look and draw conclusions regarding the positioning.
"[Defense counsel]: Judge-Judge, we object. And we really object to having this argument in front of the jury.
"THE COURT: I'm going to allow-as an expert, I'll allow her to testify what she can find pathologically, what you can find through that. Your determination as an expert as it relates to that. She can't testify obviously as you said to positioning-positioning of the parties but she can testify in her expert opinion.
"....
"Q. Based on your training, experience and background, can you tell me or tell the jury what is the anatomical positioning of-or would it be consistent with the anatomical positioning of Officer Sollohub's head being in a slightly downward position?
"[Defense counsel]: Before she answers that, Judge, I want to interpose an objection.
*1169 "THE COURT: Okay. And I sustained it earlier, but based on the representation, I will overrule it at this point and allow Dr. Ward to testify over yours and that will be accepted.
"[The State]: Thank you, Your Honor. And maybe I used inappropriate words earlier, but I meant anatomical position.
BY [the State]:
"Q. Doctor, if you would, please?
"A. Okay. Because we described a wound in an anatomic position like I described. We know he wasn't. Nobody is ever just about. But the point is the head can move in a lot of different directions. And there is so many variabilities about the position of the body could have been in when the bullet went through his head. So, then we take into account that this man is 6 feet one inches tall and his wound -bullet is going in his head in a downward direction if his head is upright. In other words, enter in the front of his left head as I'm pointing here and the bullet ends up in the back as I'm pointing here. Unless the shooter were above him, it's hard for us to recreate the wound with the body in an anatomic position. If that makes any sense.
"However if we move his head forward and to his right a little bit-in other words, he is 6'1", a little bit crouched down, then that same wound would be an anatomic position from left to right and downward if his head was tilted a little bit toward his right shoulder.
"Q. So, with this being in a downward path as you are describing, this is in a superior position?
"A. The entrance wound, yes ma'am."
(R. 986-93.)
"In Lane v. State, 673 So.2d 825 (Ala. Crim. App. 1995), we explained:
" ' "In a murder prosecution it is not permissible for a witness, including a medical expert, to draw conclusions for the jury as to the relative positions of the parties at the time of the shooting from a mere examination of the wounds. It is not competent for a witness, expert or nonexpert, to draw inferences for the jury from the slant or angle of the wound as to the relative positions of the combatants when the fatal shot was fired. 'This would be invasive of the province of the jury and a matter of which they would be quite as competent to judge as the witness, having been given a description of the wound.' Mathis v. State, 15 Ala.App. 245, 248, 73 So. 122, 124 (1916).
" ' "However, a properly qualified expert may testify to the 'path of flight' or trajectory of the bullet, Wilbanks v. State, 42 Ala.App. 39, 151 So.2d 741, cert. denied, 275 Ala. 701, 151 So.2d 744 (1963). He may testify to the slant or angle of the gunshot wound and describe its character. Woods v. State, 54 Ala.App. 591, 310 So.2d 891 (1975) ; Mathis v. State, supra. An expert may testify about the direction from which the bullet was fired or the blow was struck, Blackmon v. State, 246 Ala. 675, 680, 22 So.2d 29 (1945), Richardson v. State, 37 Ala.App. 194, 65 So.2d 715 (1953), and may state the distance between the deceased and the barrel of the weapon at the time the shot was fired. Straughn v. State, 270 Ala. 229, 121 So.2d 883 (1960).
" ' Ivey v. State, 369 So.2d at 1276, 1280 (Ala. Cr. App. 1979), writ denied, 369 So.2d 1281 (1979) (on rehearing). See also Raspberry v. State, 615 So.2d 657 (Ala. Crim. App. 1992). In this *1170 case, the coroner did not testify concerning the relative position of the parties at the time of the murder. He only discussed the angle of the victim's wounds, testimony which is permissible. Ivey; Raspberry. '
" 673 So.2d at 828-29. See also Saunders v. State, 10 So.3d 53 (Ala. Crim. App. 2007), cert. denied, Saunders v. Alabama, 556 U.S. 1258, 129 S.Ct. 2433, 174 L.Ed. 2d 229 (2009) ; Robitaille v. State, 971 So.2d 43 (Ala. Crim. App. 2005), cert. denied, Robitaille v. Alabama, 552 U.S. 990, 128 S.Ct. 490, 169 L.Ed. 2d 339 (2007)."
Whatley v. State, 146 So.3d 437, 467-68 (Ala. Crim. App. 2010).
In this case, Dr. Ward did not testify about the position of Officer Sollohub in relation to Russell but testified as to Officer Sollohub's position at the time he suffered the gunshot wound to his head. Accordingly, Russell's claim is without merit, and he is not entitled to relief on this issue.
V.
Russell contends that the trial court erred when it allowed the State to present prior consistent statements from Beard and Mason, because, he says, they were inadmissible hearsay that illegally bolstered Beard's and Mason's testimony and violated his rights under the Confrontation Clause of the United States Constitution.[21] Specifically, he claims that the prior consistent statements were admitted in response to defense counsel's impeachment of both witnesses via evidence that "Beard had been threatened with incarceration before providing police with a favorable statement";[22] evidence that "Mason had nearly 40 convictions for offenses involving dishonesty"; "evidence of a number of inconsistencies between both witnesses' testimony"; and "evidence that both witnesses had previously made inconsistent statements that conflicted with their trial testimony." (Russell's reply brief, p. 18.)
On direct examination, Beard testified that he was at that time incarcerated in the Calhoun County jail and that the charges he was facing were not in any way related to Beard's involvement with Russell's case. Beard testified that he appeared at Russell's trial under a subpoena from the State and that he had not received anything in exchange for his testimony. On cross-examination, Beard testified:
"Q: And you-you had talked to investigators that I sent over to interview you, correct?
"A. Yes.
"Q. And you freely talked to them; correct?
"A. Yes.
"Q. And they asked you to just tell them what you saw?
*1171 "A. Yes.
"Q. And they asked you just to tell the truth; right?
"A. Yes.
"Q. And did you tell them the truth?
"A. Yes.
"Q. Did you tell-did you tell my investigators that Josh-
"MS. HAMMOND [prosecutor]: Your Honor, I'm going to object at this point. One, the State has the right to see anything that he intends on asking him about regarding that issue under Rules of Impeachment if that's what he's intending to do on the statement.
"Secondly, he has not laid proper foundation or predicate for that particular question.
"THE COURT: I'm going to overrule on both grounds. I'll let him ask the question, but, I mean, he has to have a good-faith reason to ask the question to investigate it. I'll let him ask it and see where we go.
"Q. (By [defense counsel] ): Justin, you remember talking to our investigators, correct?
"A. Yes.
"Q. And they talked to you at your grandmother's house; correct?
"A. Yes.
"Q. And did you tell them that Joshua was looking away-looking away when the gun was fired?
"A. Um-
"Q. Do you remember telling them that?
"A. I just remember telling them what happened.
"Q. Are you saying you did not tell them that Josh was looking to the left-
"A. No, I ain't tell them that.
"Q. -and Officer Sollohub was to the right? Did you say that?
"A. No, sir.
"Q. Okay. Did you-did you tell the investigator that what you-what you saw, that is appeared to you that the shooting was accidental? Did you tell the investigator that?
"A. No, sir."
(R. 723-25; emphasis added.)
At that point, the State renewed its objection, and the trial court addressed the matter outside the presence of the jury. Ultimately, because Russell had impeached Beard's credibility with his purported prior inconsistent statements, the State proposed showing the video-recorded statement Beard gave to police on August 24 and August 25, 2011. After the jury returned, Russell continued his cross-examination of Beard:
"Q. And before we took a break, you already told us that the two questions I asked you, you told them, you said you didn't make those statements; right?
"A. Yes.
"Q. Do you remember what I asked?
"A. Yes.
"Q. And the two-one I asked you is: Did you tell either one of those investigators that Josh was looking, looking to the left when the gun went off? Did you tell them that? Yes or no? If you didn't, that's fine.
"A. I mean, I don't remember.
"Q. You don't remember saying that. Okay. And do you remember telling them that what you observed, it looked like an accidental shooting?
"A. (No response.)
"Q. You don't remember saying that either?
"A. No sir.
"Q. Okay. That's fine."
(R. 743-44; emphasis added.)
Mason testified on cross-examination:
*1172 "Q. ... What we're talking about here today happened on August 24th; correct?
"A. Uh-huh.
"Q. Two months later, you were actually called to give sworn testimony?
"A. Right.
"Q. And testify as to what you observed under oath; right?
"A. Right.
"Q. And in that testimony, did you not say that you heard two gunshots?
"A. I did.
"Q. But that's incorrect; right?
"A. That's incorrect.
"Q. You've since learned that that's incorrect; right?
"A. I didn't learn.
"Q. Okay. Did you also testify at your preliminary hearing that the gun was silver?
"A. I just said silver or gray, yes.
"Q. Okay. You testified it was silver, but you have since learned that that's incorrect; right?
"A. I have since learned? It was silver or gray.
"Q. It was silver or gray?
"A. Okay. Yes.
"Q. And you did testify to two gunshots; right?
"A. Yes.
"Q. The first time you got to testify, you testified to two gunshots?
"A. I did.
"Q. Okay. And you had-you were interviewed that day by police; correct?
"A. Yes.
"Q. Okay. And then you were interviewed by Ms. Hammond [prosecutor] in her office?
"A. Yes.
"Q. Okay. And when you were interviewed by Ms. Hammond at her office, did you discuss the fact that you testified to two gunshots?
"A. Yes.
"Q. Okay. So, how many gunshots do you now say there was?
"A. One gunshot.
"Q. One gunshot. And do you recall also testifying at the preliminary hearing in response to questions by Mr. McVeigh [prosecutor] that when the officer-when the officer and Joshua kind of met up, it was like a cat fight. Do you remember using that term?
"A. I do.
"Q. Now, you also-at some point, you also demonstrated what you meant by a cat fight to Jennifer [Lacy (defense counsel) ] here; correct?
"A. I mean, I could have. I met her one time, and I don't even remember-
"Q. Do you remember her coming to your house, to your mother's house and talking to you?
"A. She was in the yard, and I went out there to see who she was.
"....
"Q. Okay. And did you-did you come out and talk with Jennifer?
"A. Yes, I came out.
"Q. And you talked to her freely; right?
"A. Yeah. Yes.
"Q. And she asked you what you observed on the day of August 24th; correct?
"A. She said she wanted to clear something up, and maybe that was when I showed her the cat-fight defensive move or whatever.
"Q. You actually-you actually went further, and you positioned her where Josh was, and you stood where Sollohub was?
"A. I showed her. I didn't position.
"(Whereupon, Defendant's Exhibit No. 23 was marked for identification.)
*1173 "Q. (By [defense counsel] ): I'm going to show you what I'm going to mark as Defendant's Exhibit 23. Is that a picture of you at your mother's house?
"A. Yes.
"Q. Is that a picture of you with Jennifer Lacy?
"A. Yes.
"Q. Is that-does that refresh your recollection where you are demonstrating that cat fight-
"A. That's showing. I showed her the side of the house, and she went over there and stood. My hands are not up in the air, sir.
"Q. Did you demonstrate what you meant by 'cat fight' as-
"A. I don't recall that. I don't.
"Q. You don't recall that. Okay. There was also a time when investigators from the defense, from my office wanted to speak with you; correct?
"A. Somebody came to one of my jobs, yes.
"Q. They came, and did they not leave word for you at your mother's house for you to contact them? "A. I don't know.
"Q. Okay. But you, in fact, did not speak to them; correct?
"A. I asked them to leave my job, and they left the job, and that was the last I saw of them.
"Q. And after they left your job, you went and reported that to the district attorney, correct?
"A. Yes.
"Q. You didn't want to speak to an investigator for the defense?
"A. It wasn't that. I didn't know what I could say to them without hurting whoever. I mean, they just showed up on my job, okay.
"Q. Have you ever refused to talk to Ms. Hammond [prosecutor]?
"A. No.
"Q. Okay. Have you ever refused to talk to Mr. McVeigh [prosecutor]?
"A. No."
(R. 790-97; emphasis added.)
Russell questioned Mason further on recross-examination:
"Q. So you know Justin said-has told something totally different than you?
"A. I know our stories are different.
"Q. You know that?
"A. I know that from-I mean-
"Q. From what?
"A. When it first happened, yes.
"Q. From discussing it with the State or from discussing it with Justin?
"A. I mean, when it first happened two years ago.
"Q. I'm asking you right now. You know-
"A. I know that our stories differ just a little.
"Q. You know that your son testified differently than you?
"A. I know that.
"Q. How do you know that your son-
"A. Oh, I don't know that-
"Q. -testified differently?
"A. Oh, no, I don't know that he testified differently. I know that our stories coming in here didn't match just a little bit.
"Q. And you know before you got here today that if you testified that it was a cat fight and that Sollohub was reaching for the gun, that's more consistent with what the defense is than what the prosecution is; right?
"A. I'm just here to tell the truth."
(R. 813-14.) Mason also confirmed that she had 39 previous guilty-plea convictions for negotiating a worthless instrument.
*1174 The State moved to introduce the video-recordings of the witness statements Mason and Beard gave to police shortly after the shooting occurred. The State did so on the grounds (1) that Russell impeached Beard's credibility when he implied that Beard had told defense investigators that the gun had fired accidentally and (2) that Russell impeached Mason's credibility when he introduced evidence of her prior inconsistent statements and suggested she altered her testimony after speaking with Ms. Hammond, one of the prosecutors. The State argued that the prior consistent statements of Beard and Mason were admissible under Rule 803(1), Ala. R. Evid., the present-sense-impression exception to the rule against hearsay. Russell objected on the ground that he had not successfully impeached Beard or Mason because, he said, they denied making those prior inconsistent statements and, therefore, he did not open the door for the State to introduce any of their prior consistent statements. Russell later conceded that Mason admitted to testifying inconsistently at the preliminary hearing. Russell further argued that Beard's and Mason's interviews were not admissible in their entirety as a present-sense impression. The trial court ruled that Beard's and Mason's statements were not hearsay and were admissible under Rule 801(d)(1)(b), Ala. R. Evid., because Russell had suggested that Mason changed details of her statement after speaking with the prosecutor and because Russell had implied that Beard changed his statement when he spoke to defense investigators.
During Investigator Tim Suits's testimony, the State introduced Mason's and Beard's video-recorded statements from August 24, 2011, and Beard's video-recorded statement from August 25, 2011. Mason's statement is summarized as follows:
On the morning of August 24, 2011, Mason and her son, Justin, were in the backyard of Mason's mother's house on Walnut Street washing a car. Mason heard what she thought was a dog running toward her and then caught a glimpse of Russell,[23] who ran from the right side of the backyard between a barbeque pit and a table. Russell stopped briefly at the right side of the back of the house; he was smoking a cigarette and looked at Mason as if to tell her to be quiet. Russell then ran around the front of the house. Officer Sollohub, who was chasing Russell, did not follow Russell to the front of the house; instead, he ran in front of Mason across the backyard to the left corner of the back of the house. Officer Sollohub peeked around the corner of the house twice; the second time he looked, Officer Sollohub saw Russell coming toward him and ducked back behind the house. Russell turned around to keep running, but then turned back and shot Officer Sollohub. Mason heard a pop and saw Officer Sollohub fall. Mason saw Russell shoot Officer Sollohub with a silver gun that was not a revolver. Mason did not see where Russell went after he shot Officer Sollohub. Mason described Russell as short, somewhat heavyset, with cornrows that fell below his ears and as wearing a blue shirt and dark-colored shorts.
Beard's August 24, 2011, statement is summarized as follows:
Beard entered the interview room at the conclusion of Mason's interview, and the officers left Mason and Beard alone. Mason asked Beard if he had been able to identify the person who shot Officer Sollohub from any photographs the police had shown him. Mason urged Beard, "If you know something you need to tell *1175 these folks" and "If you know who that boy is you need to be telling them, Justin." After Mason left the interview room, Beard spoke with an officer but was reluctant to provide certain information. Beard stated that he and his mother were outside washing a car when he saw "someone chasing a light skinned dude" who "hangs out on Moore" Street. Beard said that he thought the two people were gone, so he continued washing the car until he heard a "bah" sound and looked up to see Officer Sollohub fall. Beard indicated that he recognized the person who shot Officer Sollohub but that he didn't know his name and that he was unable to identify him from a photographic lineup.
Beard's statement from 9:35 A.M. on August 25, 2011, is summarized as follows:
Beard was led into the interview room in handcuffs, and, before giving a statement, Beard said, "I'm just ready to go home." Beard identified the man who shot officer Sollohub as "Josh." Beard and his mother were outside washing a car when they looked up to see Officer Sollohub chasing Russell. Russell ran around the house and returned to the back of the house and hid behind a corner. Russell peeked around the corner twice and then drew a gun on Officer Sollohub as Officer Sollohub approached Russell. Officer Sollohub tried to grab Russell, but Officer Sollohub slipped, and Russell shot Officer Sollohub in the head. Beard stated that Russell was waiting for Officer Sollohub. When asked if the shooting was an accident, Beard stated, "Nah, he did that shit on purpose." Beard stated that he recognized Russell from around his neighborhood but that he only knew his name and did not know him personally. Beard confirmed that he identified Russell from a photographic lineup and that he was 100% positive in his identification.
Initially, we note that Russell's argument-that the trial court admitted Beard's and Mason's prior consistent statements on the bases that there were inconsistencies between each witness's testimony, that Beard had been threatened with incarceration before giving a second, favorable statement to police, and that Mason had 39 previous convictions involving a crime of dishonesty-is clearly refuted by the record. The State did not rely on any of the above-mentioned grounds in offering the prior consistent statements. In admitting the statements, the court stated:
"[I]t's offered by the State to rebut an express[ ] or implied charge against a declarant [of] improper influence or motive because you directly asked [Mason], 'Did you change a statement after you talked with Ms. Hammond [prosecutor]?,' and then you asked [Beard], 'Didn't you tell my investigator this was an accident?' He said, 'No.' It's in. So, they can offer it under [ Rule] 801 [, Ala. R. Evid]. It's not hearsay."
(R. 1319.)
"A statement is not hearsay if-
"(1) Prior Statement by Witness. The declarant testifies at the trial or hearing and is subject to cross examination concerning the statement, and the statement is
"....
"(B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive."
Rule 801, Ala. R. Evid.
The committee comments to Rule 801 state:
"An impeached witness generally may not be rehabilitated by proof of prior consistent statements. Such rehabilitation *1176 evidence may be offered, however, if the cross-examiner suggests that the witness has recently fabricated the story, has been subjected to improper influence, or has an improper motive. See McDonald v. State, 448 So.2d 460 (Ala. Crim. App. 1984). See also C. Gamble, McElroy's Alabama Evidence § 177.01 (4th ed. 1991). Even if such consistent statements are admitted, however, traditional case law admits them only for the nonsubstantive purpose of bolstering the credibility of the witness. E. Cleary, McCormick on Evidence § 251 (3d ed. 1984). The present rule, however, admits such statements as substantive evidence of the truth of the matters contained therein. The committee considers this departure from the classic hearsay principle appropriate, because the witness is on the stand and is subject to cross-examination concerning the statements."
"[I]f it is claimed that the witness' bias arose at a particular point of time, evidence that the witness, prior to such particular point of time, made a statement of substantially the same tenor as the witness' present testimony is admissible to rebut a charge of recent fabrication. Stated differently, it is said that a witness charged with a motive or interest to misstate or misrepresent the facts to which the witness has testified, growing out of the witness' relation to the cause or the litigant in whose behalf he gave testimony, may be supported and corroborated by proof that before that relation existed, the witness made statements consistent and in harmony with his testimony. What is a sufficient charge of recent fabrication or motive to testify falsely, that will open the door to rehabilitation by proof of consistent statement, is committed in large measure to the discretion of the trial court. In making this determination the trial judge may consider, in addition to the nature of the cross-examination, the statements and arguments of impeaching counsel...."
C. Gamble, McElroy's Alabama Evidence, § 177.01(4)(6th ed. 2009).
Here, Mason's trial testimony conflicted with her testimony from the preliminary hearing. On cross-examination, Mason admitted that she had testified differently at the preliminary hearing with respect to certain details of the crime; that she had met with Ms. Hammond, one of the prosecutors, after the preliminary hearing and before the trial; and that she had been less cooperative with defense investigators than she had been with the State. Russell, therefore, suggested the possibility that Mason had been subject to improper influence and was biased in favor of the State. The video-recording of Mason's statement to police showing that Mason made similar statements to those she testified to at trial, therefore, was admissible under the exception to the general rule to rebut the inference that Mason's testimony was subject to improper influence and that Mason was biased in favor of the State. See McDonald v. State, 448 So.2d 460 (Ala. Crim. App. 1984).
On cross-examination, Russell questioned Beard with respect to his purported statement to defense investigators that the shooting looked to have been accidental, interjecting the possibility that Beard had recently fabricated his testimony that the shooting was intentional. The video-recording of Beard's statement to police showing that Beard had previously made similar statements to those he testified to at trial, therefore, was admissible under the exception to the general rule to rebut the reference that Beard's testimony had recently been fabricated. See, McDonald, supra.
*1177 Moreover, the admission of Mason's and Beard's prior consistent statements did not violate Russell's rights under the Confrontation Clause. During Beard's testimony, which occurred before Mason's testimony, the State informed Russell of its intent to introduce Beard's prior consistent statements. Furthermore, Beard and Mason, who were under subpoena by the State, were subject to cross-examination by Russell during trial, and Russell could have requested that they remain available to be called again. Accordingly, we cannot say that the trial court erred in admitting the prior consistent statement, and Russell is not entitled to relief on this issue.
VI.
Russell contends that his right to present a defense was impaired and the reliability of the verdict was undermined because of the State's untimely disclosure of "objective video evidence." Specifically, Russell claims: that the State suppressed the video evidence until the end of trial; that the trial court erred when it denied his motion for a mistrial or, in the alternative, when it did not grant a continuance in his case; and that the trial court erred when it admitted "testimony and evidence purportedly regarding what was on the cameras." (Russell's brief, p. 30.)
On March 16, 2012, the trial court issued a written discovery order directing the State, upon written request from the defense, to provide "full and complete access to all documents, statements, writings, photographs, recordings, evidence, reports, and any other file materials in the possession of the State or any law enforcement agency involved in this case which may be known to exist or which, with due diligence, could be determined to exist." (C. 86.)
On September 4, 2013, Russell filed a written motion requesting that the State produce "[a]ny and all video, audio, digital, and/or electronic recordings from the police vehicles [and Scorpion brand body cameras] of Officers Sollohub and Bostick that would show the stop and subsequent chase" that occurred on August 24, 2011. The trial court addressed Russell's motion at a pretrial hearing held on September 6, 2013:
"[The State]: Judge, to my knowledge, there was not a video from either vehicle or from the Scorpion devices that they were wearing or at least Officer Sollohub was wearing. We have inquired again, and I called the police department and said if it exists or existed we need to know. I have been given no information that such a video exists or existed.
"THE COURT: And, [defense counsel], I'll grant that motion, if they have it or if they don't, but it will be a continuing open order that they will provide that if it becomes available later on if they find out, they provide something."
(R. 35.)
On the morning of September 13, 2013-the last day of trial-the State informed the trial court that Sgt. Scott Grissom of the Anniston Police Department had disclosed the existence of a corrupted video file that had been downloaded from Officer Sollohub's Scorpion device on August 24, 2011.
"MR. MCVEIGH [prosecutor]: Judge, one more issue. Ms. Hammond [prosecutor] has Scott Grissom as a witness this morning. He mentioned to us all along there is no video from the Scorpion device, nothing on them, or corrupted file, or nothing accessible. In discussing this morning, you know, was anything preserved. The corrupted file was preserved on the server at Anniston. We had asked, asked, asked, asked, asked. This [ ]is the first time we've heard of it. It was just e-mailed to us, *1178 and Mr. Moeller [prosecutor] is burning it to DVDs right now.
"....
"THE COURT: If it's corrupt, are you going to be able to recover anything from it?
"....
"MR. MCVEIGH [prosecutor]: Again, his motion and we have open file discovery if there is a bit of information on there, I feel like I have the duty to tell the court, to provide it to the defense. We've been told it's nothing. I think that's not the police's decision to make and if there is a corrupted file-
"THE COURT: And [defense counsel] is free to impeach or make any implication he wants about what so far there may or may not be a video and what happened to that, that's within his-
"MR. MCVEIGH [prosecutor]: I'm just attempting to comply with my discovery.
"[Defense counsel]: Judge, I asked-and understand we're almost at the end of the trial, and this is something that's been in the possession and we've asked for on more than one occasion, and I believe it was deliberately withheld from the district attorney's office.
"THE COURT: And whether it was or not, [defense counsel], there is nothing there. And again, go back to your argument we had last week and why are we worried about this because here are your words and I'm paraphrasing, 'Why are we worried? We know he was stopped by Officer Sollohub. We know that he ran from him. We know that Sollohub chased him. And we know that Sollohub was shot in the head by a gun which the defendant was holding.' And whether it was an accident or not, what's on that video, I guess, to go back to your argument, 'Why does it matter?'
"[Defense counsel]: And that's-why would it matter-why would it matter? Why it would matter is the fact that there is something on there, that there was something on there that the police department did not want the defense to see or this jury to see. If ... you're going to withhold evidence that really shouldn't matter in this case because it's not a justification to take anybody's life what took place there, what actually took place, that you're going to withhold that, what-it calls into question-it calls into question-
"THE COURT: That's for closing[ ] argument, but legal argument none [sic]. Your client is right there. Ask him what happened. And if he tells you something different. But, [defense counsel], you need to take off a [foil] hat. It's not a conspiracy at this point there was something on that tape. If there was something that was improper, your defendant-the defendant can tell you. Perfect closing arguments. But for the purpose of this hearing right here, I don't know what you're making-I don't understand the argument. You're saying I just need to stop and postpone the trial or we need to start over just because they've just given you this information which basically says there's nothing there.
"[Defense counsel]: I don't know if there-if there is nothing on there.
"THE COURT: Again, ask him. Just ask him if there was something that happened out there that you think that the police would [have] wanted to conceal.
"[Defense counsel]: I've already asked him.
"....
"THE COURT: I don't-I just don't understand with why we're wasting time to argue this. There is nothing there. If *1179 you want to impeach Grissom, imply he in some way withheld this improperly or erased something, that is clearly in your discretion of cross-examination. That is clearly an area you can argue at closing argument. But to sit here and tell me at this point-and I don't know-what do you-
"[Defense counsel]: The only remedy is to declare a mistrial at this point. That's the only remedy ... is to declare a mistrial. Withholding the evidence could be important in a capital murder case.
"THE COURT: Proffer for the record-proffer for the record what impropriety that there is and what you speculate that evidence would be and in what way that would [provide] justification for the shooting.
"[Defense counsel]: It does not create a justification for this shooting but if there is any evidence on there, it may-it may be the actual story of-if there is any evidence on it, it would be the actual sure story of what happened in the initial-in the initial stop between Sollohub and my client, which is inconsistent to what Bostick testified to, and it-it would impeach his testimony.
"THE COURT: But they've told you the file was corrupted.
"[Defense counsel]: They told us today.
"THE COURT: But I was told at least two or three weeks ago the Scorpion device was [not] engaged.
"[Defense counsel]: We're talking about video.
"MS. HAMMOND [prosecutor]: This is a video.
"....
"THE COURT: ... Let's assume a minute your client said at any point in his statement, 'Officer Sollohub stopped and he took out his pistol and he pistol-whipped me and then he rared back as though he was going to hit me again. I was in fear for my life. I ran and took cover and then I shot him in self-defense because I thought at that point he was going to hurt me.' He never-he never alleged that. No injuries on him. He had never made that statement. So, I don't understand why that initial encounter has any bearing whatsoever.
"You say it's not justification. I understand your argument they've withheld this. So, if they acted improperly in this case in that instance that they may have done that throughout [ ] this trial again, that's closing arguments. But I don't know what you've put forth to show they have in any way been improper in their investigation because the question simply comes down to the fact was it-did your client discharge that weapon with the intent to kill Officer Sollohub or was it simply a reckless act.
"[Defense counsel]: And that's the case absolutely.
"THE COURT: Well, so I guess I'm still trying to wrap my head around again what relevance this is in any-any way. And if you're going to say the police acted [ ] improperly at some point in the investigation, again that's closing argument stuff. But just to come in and say, 'Judge, we need a mistrial,' and that-I think even you would have to admit if you stepped aside for a minute and looked at this independently, that's a little extreme over a video which they've been telling you for at least a month, I guess-
"....
"... that the Scorpion device was never engaged so there wasn't really a video.
"[Defense counsel]: Okay. But the video chip from the car was removed from both the cars. And I guess we-I guess we still [do not] have an update on *1180 that. But today this morning we get an update on Scorpion, and I don't want to belabor the point. I think my point is as clear as I can make it on the record. And, you know, I [made]-you know, respectfully [made] a motion for mistrial, you denied it. I'm ready to go forward."
(R. 1325-34.)
Sgt. Grissom testified that he obtained digital video cards from the video camera located in Officer Sollohub's patrol vehicle and the Scorpion recording device that Officer Sollohub was wearing on August 24, 2011. Shortly thereafter, Sgt. Grissom downloaded the contents of the video cards onto his computer. There was no recorded footage from the camera in Officer Sollohub's patrol vehicle.[24] On the other hand, Sgt. Grissom was able to view several videos from the Scorpion device; none of those videos, however, was pertinent to the instant case.
With respect to the video at issue here, Sgt. Grissom downloaded and attempted to view the video, but because the file was corrupted he could see only "a blank screen" with "nothing there." Sgt. Grissom and an information-technology professional both attempted to access and to restore the corrupted file but were ultimately unsuccessful. Sgt. Grissom testified that, because the software that had originally been provided with the Scorpion devices was also corrupted, there was no way of knowing the correct dates and times for any of the videos recorded by the Scorpion device.
On cross-examination, Sgt. Grissom testified that he gave the video cards from Officer Sollohub's vehicle and Scorpion device to either Investigator Osburn or Investigator Mark Bentley on August 25, 2011. After that point, no one at the Anniston Police Department was able to locate the video cards.[25] On September 10, 2013, Sgt. Grissom became aware that the corrupt file from Officer Sollohub's Scorpion device remained on Anniston Police Department's server; he had assumed the file had been purged according to normal procedure. Sgt. Grissom testified that the video "looked like it did the day it was downloaded. There was nothing new, nothing has been removed in it."
The State subsequently moved to introduce the video, and Russell objected:
"THE COURT: ... We'll let the record reflect [that] we'll have a discussion about State's offer of State's Exhibit 71, *1181 which we now understand belongs to the defense.
"....
"[Defense counsel]: And I don't want to waste a lot of the court's time. But to allow them to introduce this piece of evidence is-we have no way, absolutely no way between now-between right now and even Monday to have this examined to see if an independent examiner could obtain different information from it. And here we are in the death of a police officer when we have introduced countless, countless, countless of just collateral materials that doesn't have anything really to do with the issues in this case and now we have-which could be an important piece of evidence, it gets turned over to the State Friday morning, this morning and the State wants to play it without us ever having an opportunity to examine it to see if it actually contains anything that may be useful to the defense.
"MS. HAMMOND [prosecutor]: We can watch it now.
"THE COURT: How long is it?
"MS. HAMMOND [prosecutor]: About five seconds of a drunk man and nothing. So, we can play it. I apologize for describing the man as a drunk man, Your Honor, but I don't understand him. He's slurring his words.
".... And I think there may even be one of Scott when he was attempting to download it at some point.
"THE COURT: All right. For what it's worth, [defense counsel], let me just watch it. Have you seen it?
"[Defense counsel]: Yes.
"THE COURT: Just so I can see where we're going.
"MR. MOELLER [prosecutor]: That's the one that looks like it was corrupted, Judge.
"(State's Exhibit 71 was played in open court.)
"MR. MOELLER [prosecutor]: That's it.
"(State's Exhibit 71 was played in open court.)
"MR. MOELLER [prosecutor]: And the other one.
"THE COURT: [Defense counsel], you want to restate your objection to playing it?
"[Defense counsel]: Judge, there is no way for us to verify what this officer has represented that they are-there is not more information can be taken off of that if information was deleted. There is absolutely no way to do that based upon us getting this in the middle of trial. I mean, there is no way. And in so-
"THE COURT: So, if we don't play it, that's it. There is no objection. Because he's testified that he's looked at it and seen it. Okay. I'm excluding it. You can't play it. It's been marked, you can put it in. I understand he's testified and so any way I know that may leave a question with the jury but really I don't mind. I assume, you know, that [defense counsel] would make an argument that says, you know, we had the video but we never saw it, we didn't play it, then we get an issue at that point. So, [defense counsel], if I could just instruct you obviously, you can't have it both ways.
"[Defense counsel]: But I'm going to argue that-I'm going to make the argument you know that two critical pieces of evidence in this case are missing.
"MS. HAMMOND [prosecutor]: Your Honor, that's-
"[Defense counsel]: We have tweezers that have nothing to do with this case. We have a cigarette butt that has nothing to do with this case. We have a hat that has nothing to do with this case. We have countless things that have nothing to do with this case. And what could be-could be useful information-I
*1182 mean the video, the SD chips from two police vehicles that were involved in the initial stop of him. They're both missing? Really?
"MS. HAMMOND [prosecutor]: Judge, first of all, there is no indication that Officer Sollohub's camera was ever activated. It would only be activated under one of three circumstances. And when Sergeant Grissom got there, it had not been activated. And under the circumstances of the stop and talk with the defendant, there would not have been a need for the overhead lights to be activated, therefore the camera would never be activated. The Scorpion on the other hand, does not show that it was even activated at any time either, other than what was on there previously, which we don't know the date of.
"[Defense counsel]: Judge, you know what, I withdraw my objection. If they want to play it, play it. I mean-
"THE COURT: This is almost-I'm not trying to tell y'all how to try your case but the first week in law school I learned a saying called a red herring. Kind of what this is, you're throwing a red herring in the jury box. If you want to play it and I guess he's withdrawing his objection, you can play it. He's testified there is nothing there. Y'all know there is nothing there. But just for completeness sake to show the jury is nothing of any importance. If he's withdrawn it and y'all want to play it, we'll bring them back in and play it.
"And, [defense counsel], even if they don't, you're still free to argue that those SD cards are missing. Because even though they've produced something that they're alleging what was taken from at least one of those, that being the scorpion device.
"[Defense counsel]: We have no way of knowing that's the only information on the SD card.
"MR. MCVEIGH [prosecutor]: Nor do I, Judge.
"[Defense counsel] I am not making any-
"MR. MCVEIGH [prosecutor]: As officers of the court, my case is what's given to me. And [defense counsel] and I would probably like to see all those cards, but if I don't have them, I don't have them. He can make the argument he needs to make. I understand that totally. But-
"THE COURT: I think it's clear from Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),] and any progeny after Brady that says the police department gets direct attention from the State and if they don't produce it, it's as [if] you didn't produce it. You have a certain responsibility to gather that. I'm not alleging anything on that. I'm just saying that he's free to make that argument even though he hasn't said anything derogatory about y'all in your discovery and production of this.
"All right. We'll bring [the jury] back in. Y'all play it...."
(R. 1419-26; emphasis added.) The video was played for the jury. A review of the disk purporting to hold the corrupted file shows two files; this Court was able to view one video that showed an intoxicated white male speaking with police officers, but the second video file was not accessible.
A.
Russell contends that the State suppressed "objective video evidence until nearly the end of trial" in violation Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963). Specifically, he claims that the late disclosure of the video files prevented defense counsel from conducting an independent evaluation of the video; denied defense counsel the opportunity to *1183 adequately cross-examine key witnesses; and prohibited defense counsel from effectively responding to the State's evidence that no recoverable videos from Officer Sollohub's patrol-car camera or Scorpion device existed.
This Court has stated:
"There is no constitutional right to discovery in a criminal case. Discovery is governed in Alabama by Rule 16, [Ala. R. Crim. P.] However, the United States Supreme Court has held that it is a denial of due process when the prosecution suppresses exculpatory evidence. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963). The United States Supreme Court in Brady stated the following:
" '[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'
" Brady, 373 U.S. at 87, 83 S.Ct. at 1196. (Emphasis added.)
"To prove a Brady violation, a defendant must show (1) that the prosecution suppressed evidence, (2) that the evidence was of a character favorable to his defense, and (3) that the evidence was material. Ex parte Cammon, 578 So.2d 1089, 1091 (Ala. 1991) ; Ex parte Brown, 548 So.2d 993, 994 (Ala. 1989)."
Jefferson v. State, 645 So.2d 313, 315 (Ala. Crim. App. 1994).
Presuming, without deciding, that the prosecution suppressed the video evidence,[26] Russell fails to meet the remaining two prongs-that the evidence was favorable to his defense and that it was material to his guilt or punishment.
Russell argues that "[v]ideo evidence from Officer Sollohub's vest camera would have provided an objective account of the incident." (Russell's reply brief, p. 6.) Nothing in the record supports this claim or indicates that the video would have been exculpatory.[27] Moreover, the record does not show that the evidence was material.
"The United State Supreme Court in [United States v.] Bagley [, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed. 2d 481 (1985),] defined 'material' in relation to the disclosure of evidence. The court stated:
" '[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'
" 473 U.S. at 682, 105 S.Ct. at 3383. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed. 2d 342 (1976)."
Jefferson, 645 So.2d at 316. We cannot say that there is a reasonable probability that, had the corrupted file been disclosed to the defense in a timely manner, the result of Russell's trial would have been different. Because the video evidence was not exculpatory or material, the State's suppression *1184 of it, if indeed it was suppressed, did not violate Brady in this case.
Furthermore, Russell's claim more closely resembles an issue of lost or destroyed evidence that the defense did not have the opportunity to examine for potentially exculpatory evidence akin to that of Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed. 2d 281 (1988).
This Court has stated:
" 'For this court to find a violation of due process because evidence has been lost, we must consider (1) the culpability of the prosecution, (2) the materiality of the lost evidence, and the (3) sufficiency of the other evidence.' Grimsley v. State, 678 So.2d 1197, 1206 (Ala. Crim. App. 1996)....
" ' "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." [Arizona v.] Youngblood [, 488 U.S. 51] at 58, 109 S.Ct. [333] at 337 [ (1988) ]. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Youngblood, 488 U.S. at 57, 109 S.Ct. 333 (footnote), 109 S.Ct. at 337 (footnote), citing Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed. 2d 1217 (1959).'
Pickering v. State, 194 So.3d 980, 984-85 (Ala. Crim. App. 2015) (quoting Ex parte Gingo, 605 So.2d 1237, 1240-41 (Ala. 1992) ).
Sgt. Grissom testified that the he discovered one corrupted video file recorded onto Officer Sollohub's Scorpion device and that he did know the date or time that file was recorded. Sgt. Grissom attempted to recover the file but was unsuccessful. At the time the file was discovered and at all times thereafter, the corrupted file had no obvious exculpatory value. Accordingly, when the State requested any video files, the APD had nothing of relevance to Russell's case to provide to the prosecution. Sgt. Grissom assumed the file, which was located on the APD server, had ultimately been purged. Once Russell's trial began, however, Sgt. Grissom discovered that the file still existed. Sgt. Grissom testified that the corrupted file appeared exactly the same as it had when he downloaded on August 24, 2011. Therefore, we cannot say that the police acted in bad faith in this regard.
Moreover, the video evidence was not material to Russell's case.
" 'To meet this standard of constitutional materiality [of the lost or destroyed video] ... evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' California v. Trombetta, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed. 2d 413 (1984)."
Scott v. State, 163 So.3d 389, 445-46 (Ala. Crim. App. 2012).
As noted above, the evidence did not possess any exculpatory value that was apparent before the evidence was destroyed. In light of the sufficiency of the State's evidence that Russell intentionally shot Officer Sollohub-Headley's testimony regarding the weight necessary to pull the trigger and the high probability that the gun was not inadvertently fired combined with the fact that the safety was on when Russell and the gun were discovered, among other reasons-and the absence of culpability of the police and lack of materiality of the evidence, we cannot say that Russell was denied due process of law as a *1185 result of the untimely disclosure of the video evidence.
B.
Russell contends that the trial court erred when it denied his motion for a mistrial or, in the alternative, did not grant a continuance in his case so that defense counsel could evaluate the video evidence.
" 'A mistrial is a drastic remedy that should be used sparingly and only to prevent a manifest injustice.' Hammonds v. State, 777 So.2d 750, 767 (Ala. Crim. App. 1999) (citing Ex parte Thomas, 625 So.2d 1156 (Ala. 1993) ), aff'd, 777 So.2d 777 (Ala. 2000). A mistrial is the appropriate remedy when a fundamental error in a trial vitiates its result. Levett v. State, 593 So.2d 130, 135 (Ala. Crim. App. 1991). 'The decision whether to grant a mistrial rests within the sound discretion of the trial court and the court's ruling on a motion for a mistrial will not be overturned absent a manifest abuse of that discretion.' Peoples v. State, 951 So.2d 755, 762 (Ala. Crim. App. 2006)."
Garzarek v. State, 153 So.3d 840, 852 (Ala. Crim. App. 2013). As noted above, the video evidence was not exculpatory to Russell's defense and was not material to his guilt or punishment. Granting Russell's motion for a mistrial, therefore, would not have prevented a manifest injustice, and we cannot say that the trial court abused its discretion when it denied Russell's motion.
With respect to Russell's claim that the trial court should have granted a continuance, Russell did not raise this issue at trial. Therefore, we review this claim for plain-error only. See Rule 45A, Ala. R. App. P.
" ' " 'A motion for a continuance is addressed to the discretion of the court and the court's ruling on it will not be disturbed unless there is an abuse of discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973). If the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence. Knowles v. Blue, 209 Ala. 27, 32, 95 So. 481, 485-86 (1923).'
" ' Fortenberry v. State, 545 So.2d 129, 138 (Ala. Crim. App. 1988).'
" Ex parte Clark, 728 So.2d 1126, 1134 (Ala. 1998) (quoting Ex parte Saranthus, 501 So.2d 1256, 1257 (Ala. 1986) ). See also Scott v. State, 937 So.2d 1065, 1076 (Ala. Crim. App. 2005).
Eatmon v. State, 992 So.2d 64, 68 (Ala. Crim. App. 2007).
Russell's only argument that his trial should not have proceeded rested on his contention that any evidence potentially recovered from the corrupted file might "be the actual sure story of what happened in the initial ... stop between [Officer] Sollohub and [Russell], which is inconsistent to what [Officer] Bostick testified to, and it-it would impeach his testimony." Nothing in the record indicates that such evidence would have been forthcoming if the case had been continued. Therefore, we cannot say that the trial court committed plain error, much less abused its discretion, when it did not grant a continuance here.
C.
Russell contends that the trial court erred when it admitted "testimony and evidence purportedly regarding what was *1186 on the cameras." (Russell's brief, p. 30.) We note that, although Russell objected to this evidence at trial, he ultimately withdrew that objection. Accordingly, we review this claim for plain error only. See Rule 45A, Ala. R. App. P.
As noted above, the complained-of evidence was not exculpatory or material. In fact, the evidence showed only that Officer Sollohub's Scorpion device was not activated and did not record anything pertinent to Russell's case. Therefore, we cannot say that admission of such evidence constitutes plain error. Accordingly, Russell is not entitled to relief on this claim.
VII.
Russell contends that the "trial court committed plain error by failing to instruct the jury that the extensive evidence of collateral bad acts that were admitted over defense counsel's objections could be used for limited purposes, and not as evidence of bad or guilty character."[28] (Russell's brief, p. 69.) Specifically, Russell challenges the lack of a limiting instruction regarding evidence that he pointed a cellular telephone at a police officer in an attempt to resist arrest in 2008, evidence that implied that he stole the firearm used in the shooting, and evidence that he told McCurdy that he "wasn't going back to jail." Because Russell did not request such an instruction from the trial court,[29] we review this claim for plain error only.
" 'The admission or exclusion of evidence is a matter within the sound discretion of the trial court.' Taylor v. State, 808 So.2d 1148, 1191 (Ala. Crim. App. 2000), aff'd, 808 So.2d 1215 (Ala. 2001). 'The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion.' Ex parte Loggins, 771 So.2d 1093, 1103 (Ala. 2000). This is equally true with regard to the admission of collateral-bad-acts evidence. See Davis v. State, 740 So.2d 1115, 1130 (Ala. Crim. App. 1998). See also Irvin v. State, 940 So.2d 331, 344-46 (Ala. Crim. App. 2005)."
Frye v. State, 185 So.3d 1156, 1161-62 (Ala. Crim. App. 2015) (quoting Windsor v. State, 110 So.3d 876, 880 (Ala. Crim. App. 2012) ).
" Rule 404(b), Ala. R. Evid., provides, in relevant part:
" 'Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident ....'
"In discussing the motive-and-intent exception to the general exclusionary rule, the Alabama Supreme Court has stated:
" ' "Intent is the ripened purpose to effect a result; while motive is the moving power which leads the mind to desire the result and form the purpose." Fuller v. State, 269 Ala. 312, 336, 113 So.2d 153, 175 (1959). Motive is defined as "an inducement, or that *1187 which leads or tempts the mind to do or commit the crime charged." Spicer v. State, 188 Ala. 9, 11, 65 So. 972, 977 (1914). Motive has been described as "that state of mind which works to 'supply the reason that nudges the will and prods the mind to indulge the criminal intent.' " [Charles Gamble, Character Evidence: A Comprehensive Approach 42 (1987).]
" 'Furthermore, testimony offered for the purpose of showing motive is always admissible. McClendon v. State, 243 Ala. 218, 8 So.2d 883 (1942). Accord, Donahoo v. State, 505 So.2d 1067 (Ala. Cr. App. 1986). " 'It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.' McAdory v. State, 62 Ala. 154 [ (1878) ]." Nickerson v. State, 205 Ala. 684, 685, 88 So. 905, 907 (1921).'
" Bowden v. State, 538 So.2d 1226, 1235 (Ala. 1988). '[T]he fact that evidence tending to show a motive to do an act charged to a person would also tend to prove that person guilty of another crime is no bar to the admission of such evidence.' C. Gamble, McElroy's Alabama Evidence § 45.01(7)(6th ed. 2009).
" 'Evidence which pertains to an accused's motive or intent to commit the presently-charged offense is admissible as an exception to the general exclusionary rule applying to collateral acts or offenses. Nelson v. State, 511 So.2d 225, 236 (Ala. Cr. App. 1986), aff'd 511 So.2d 248 (Ala. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed. 2d 217 (1988) ; Dyess v. State, 418 So.2d 208 (Ala. Cr. App. 1982) ; Terry v. State, 397 So.2d 217 (Ala. Cr. App.), writ denied, Ex parte Terry, 397 So.2d 223 (Ala. 1981). See also C. Gamble, McElroy's Alabama Evidence § 36.01(7)(3rd [e]d 1977). "Moreover, if the accused's commission of another crime is admissible in a present prosecution, the State may prove in meticulous detail the manner in which the accused committed such other crime." (Citations omitted.) Nelson, supra at 234,.'
" Coleman v. State, 552 So.2d 156, 158 (Ala. Crim. App. 1988)."
Thompson v. State, 153 So.3d 84, 135-36 (Ala. Crim. App. 2012).
Here, the State was required to prove that Russell intended to kill Officer Sollohub. Russell's defense was that the shooting was accidental and that he did not possess the specific intent to kill. The admission of the Rule 404(b) evidence to establish Russell's motive and intent and, therefore, the capital offense with which he was charged, was crucial to the State's case. Accordingly, such evidence was properly admitted.
Regarding the trial court's failure to sua sponte issue a limiting instruction on the use of the prior-bad-act-evidence, this Court has stated:
"Recently, in Ex parte Billups, 86 So.3d 1079 (Ala. 2010), the Alabama Supreme Court held that an overbroad limiting instruction on the use of prior bad act evidence that allows the jury to consider the evidence for an improper purpose constitutes plain error. However, the Supreme Court left undisturbed its earlier holding in Johnson v. State, 120 So.3d 1119 (Ala. 2006), that a trial court has no duty to sua sponte give a limiting instruction when the prior bad act evidence is offered as substantive evidence of guilt. In addressing the Supreme Court's decision in Johnson v. State, this Court has stated:
" 'Dotch argues that the trial court committed plain error by failing to sua sponte give limiting instructions to the jury concerning its use of the prior-conviction evidence. However, in a *1188 similar case, the Alabama Supreme Court has held that such limiting instructions are not necessary because, as in the present case, the prior convictions were being introduced as substance evidence. Johnson v. State, 120 So.3d 1119 [ (Ala. 2006) ].
" 'Although Dotch cites Ex parte Minor, 780 So.2d 796 (Ala. 2000), and Snyder v. State, 893 So.2d 482 (Ala. 2001), in support of his claim, the Alabama Supreme Court in Johnson v. State, 120 So.3d at 1128, distinguished those cases from the present situation, because in those cases, the prior-conviction evidence was being introduced to impeach the defendant's credibility. In those cases, the prior convictions were not substantive evidence of the offenses. The Court wrote:
" ' "It is contradictory and inconsistent to allow, on the one hand, evidence of Johnson's prior bigamy conviction and prior bad acts as substantive evidence of the offense with which she was charged, yet, on the other hand, to require a limiting instruction instructing the jury that it cannot consider the evidence as substantive evidence that Johnson committed the charged offense.
" ' Johnson v. State, 120 So.3d at 1128.' "
Boyle v. State, 154 So.3d 171, 211-12 (Ala. Crim. App. 2013) (quoting Dotch v. State, 67 So.3d 936, 969-70 (Ala. Crim. App. 2010) ).
Here, Russell's prior bad acts were admitted as substantive evidence of guilt and not for impeachment purposes. Therefore, the trial court did not commit plain error in failing to sua sponte issue a limiting instruction regarding the use of the Rule 404(b) evidence. Accordingly, Russell's claim is without merit, and he is not entitled to relief on this issue.
Penalty-Phase Issues
VIII.
Russell contends that the prosecutor's statements during voir dire and the trial court's instructions during the penalty phase "impermissibly lessened the jury's responsibility."[30] (Russell's brief, p. 91.) Russell did not object to the prosecutor's statements or to the court's instructions; therefore, we review this issue for plain error only.
During voir dire, the prosecutor informed the first panel of veniremembers that, in the event the defendant was found guilty of capital murder, the jurors would consider mitigating and aggravating evidence, and would "weigh that, and [ ] tell the Judge what you believe the verdict should be, and then ultimately the Judge makes that decision." (R. 202.) The prosecutor told the second panel of veniremembers: "[Y]ou advise the court what that sentence would be, and then ultimately the court makes the decision what the punishment should be." (R. 255.) The prosecutor said to the third panel of veniremembers: "[U]ltimately you make a recommendation to the court as [to] what the decision [regarding the defendant's sentence] should be." (R. 310.) When speaking to potential juror A.B.-who had indicated that she was opposed to the death penalty-during individual voir dire, the court informed A.B.: "[Y]ou'd just be making a recommendation. I make the final determination, and I would determine what the defendant's sentence was, but your recommendation would play a part in that as the jury."[31] (R. 411.)
*1189 Following the jury's return of a verdict in the guilt phase of the trial, the trial court informed the jury:
"[T]here is an additional phase of this trial that we move to next. It's called the sentencing phase, whereby you will make an advisory verdict to me, what you recommend the sentence to be. That being life without [the possibility of parole] or death, depending on whether [or] not the State can offer any aggravating factors."
(R. 1704-05.) Before the jury commenced deliberations in the sentencing phase, the trial court instructed the jury:
"The law of this State provides that the punishment ... for the capital offense of murder of a law enforcement officer for which this defendant has been convicted is either life imprisonment without the possibility of parole or death.
"....
"The issue at this sentencing hearing concerns the existence of aggravating and mitigating circumstances, which you should weigh against each other to determine the punishment that you would recommend. Your verdict recommending a sentence should be based upon the evidence that you have heard while deciding the guilt or innocence of the defendant and any evidence that's been presented to you in these proceedings in the punishment phase. As the trial judge, I must consider your verdict recommending a sentence in making a final decision regarding the defendant's sentence."
(R. 1967-69.)
Russell cites Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), for the proposition that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the death sentence rests elsewhere." 472 U.S. at 328-29, 105 S.Ct. at 2639. This Court has stated, however:
"[U]nder Alabama law, the trial judge-not the jury-is the 'sentencer.' '[W]e reaffirm the principle that, in Alabama, the "judge, and not the jury, is the final sentencing authority in criminal proceedings." Ex parte Hays, 518 So.2d 768, 774 (Ala. 1986) ; Beck v. State, 396 So.2d [645] at 659 [ (Ala. 1980) ] ; Jacobs v. State, 361 So.2d 640, 644 (Ala. 1978), cert. denied, 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed. 2d 83 (1979).' Ex parte Giles, 632 So.2d 577, 583 (Ala. 1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed. 2d 825 (1994). 'The jury's verdict whether to sentence a defendant to death or to life without parole is advisory only.' Bush v. State, 431 So.2d 555, 559 (Ala. Crim. App. 1982), aff'd, 431 So.2d 563 (Ala. 1983), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed. 2d 175 (1983). See also Sockwell v. State, [675] So.2d [4] (Ala. Crim. App. 1993). 'We have previously held that the trial court does not diminish the jury's role or commit error when it states during the jury charge in the penalty phase of a death case that the jury's verdict is a recommendation or an "advisory verdict." White v. State, 587 So.2d 1218 (Ala. Cr. App. 1990), aff'd, 587 So.2d 1236 (Ala. 1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed. 2d 142 (1992).' Burton v. State, 651 So.2d 641 (Ala Cr. App. 1993)."
Taylor v. State, 666 So.2d 36, 50-51 (Ala. Crim. App. 1994) (footnote omitted); see also Jackson v. State, 169 So.3d 1, 98 (Ala. Crim. App. 2010) ("Here, the circuit court *1190 properly instructed the jury of its role under § 13A-5-46, Ala. Code 1975, taking care to emphasize the fact that its verdict was merely advisory did not absolve the jury of its responsibility in determining the appropriateness of the death sentence.").
Russell appears to cite Ex parte McGriff, 908 So.2d 1024, 1038 (Ala. 2004), for the proposition that a court may not instruct a jury that its verdict in the sentencing phase is advisory or a recommendation. We note, however, that McGriff states:
"At no time during a retrial of the charge against McGriff should the jury be told that its decision on the issue of whether the proffered aggravating circumstance exists is 'advisory' or 'recommending.' Rather, the jury should be instructed that, it if determines that the aggravating circumstance does not exist, the jury must return a verdict, binding on the trial court, assessing life imprisonment without the possibility of parole as the penalty."
908 So.2d at 1038 (emphasis added).
With respect to aggravating circumstances, the trial court instructed the jury:
"[T]he burden of proof is on the State to convince each of you beyond a reasonable doubt as to the existence of any aggravating circumstances to be considered by you in determining what punishment is to be recommended in this case. That means that before you can even consider recommending that the defendant's punishment be death, each and every one of you must be convinced beyond a reasonable doubt based upon the evidence that at least one of [the] aggravating circumstances exists. If you are not unanimously convinced that one and the same aggravating circumstance exists beyond a reasonable doubt based on the evidence, then you must return a verdict binding on the trial court sentencing the defendant to life imprisonment without the possibility of parole, regardless of whether there are any mitigating circumstances in this case."
(R. 1971-72.) The trial court further stated:
"Now, before you can make a recommendation of death or life imprisonment without parole, each and every one of you must be convinced beyond a reasonable doubt based on the evidence that at least one aggravating circumstance exists. If you cannot agree that at least one aggravating circumstance exists, you must return a verdict finding on this court as assessing a penalty of life imprisonment without parole."
(R. 1979.)
In Russell's case, the trial court did not instruct the jury that its decision with respect to aggravating circumstances was advisory or a recommendation. Therefore, Russell's reliance on McGriff is misplaced. Accordingly, we find no error, plain or otherwise, and Russell is not entitled to relief on this issue.
IX.
Russell contends that the trial court erred when it allowed the State, in support of the aggravating circumstance that Russell was under the sentence of imprisonment when he committed the capital offense, to introduce evidence of Russell's municipal-court conviction for which, he says, he was not represented by counsel.[32]
At a pretrial hearing held on August 14, 2013, the State gave notice that it intended to introduce Russell's municipal-court conviction[33] as an aggravating circumstance-specifically, *1191 that Russell was under a sentence of imprisonment when he committed the capital offense. See § 13A-5-49(1), Ala. Code 1975. On August 29, 2013, Russell filed a written objection to the State's use of his municipal-court conviction, arguing
"that there is no evidence presented by the State that he was represented by counsel in the Municipal Court of Anniston on this theft-of-property in the third-degree charge or that he voluntarily, intelligently, knowingly, properly and constitutionally waived his right to counsel. An un-counseled felony conviction or DUI [driving-under-the-influence] conviction cannot be used for sentencing enhancement purposes under the habitual-felony-offender statute or the DUI statute. An uncounseled municipal-ordinance violation, by the same logic, should not qualify as an aggravating circumstance to justify imposition of the death penalty."
(C. 198-99.) The trial court thereafter issued a written order noting Russell's objection stating, "Should this case reach a sentencing phase, this objection will be addressed at that time."
After the jury returned its verdict in the guilt phase, the State discussed the aggravating circumstances it intended to prove during the penalty phase:
"Mr. McVeigh [prosecutor]: ... [Defense counsel] had filed a motion at one point I think possibly objecting to one of the lessers or we had had a discussion about that. It was sort of moot at the time, now it has become germane on the issue of being under a sentence through a city court under a municipal charge. So, I turn it over to Ms. Hammond [prosecutor].
"THE COURT: We've looked at that and I don't know. [Defense counsel], have you read Burgess?[34 ]
"[Defense counsel]: I did, Your Honor, but it's a different situation. The one that [the State is] trying to use is an uncounseled municipal ordinance violation. There is no-there is no indication that he had representation. It was coming under the [Habitual] Felony Offender Act. And couldn't use that as enhancement in a DUI [driving-under-the-influence] uncounseled conviction in this case, as we would object to uncounseled misdemeanor municipal ordinance being used as aggravating circumstances. In the Burgess case, defense counsel didn't object to it. And that was-it was reviewed on appeal on a plain error. And we're making [a] specific objection prior to [the] start of the penalty phase that that's an uncounseled municipal ordinance violation. I don't think it should rise to a level of an aggravating circumstance.
"Ms. Hammond [prosecutor]: Judge, Burgess does not make that distinction. The court reviewed that under plain error and found there was no error and then followed with it. Burgess is the holding case that makes no distinction as to whether or not you're counseled or uncounseled. The defense counsel did not make the objection, although the court did go back and look at it, and the Court moved forward with it and found no problem with it. Burgess is good law.
"THE COURT: I'll review it. And my inclination is to let them present it and *1192 then if it comes back, it comes back and we do the sentencing phase again. But I'm going to look at it, [defense counsel]. Let me read it. Because I did read it as far as the aspect as how it applies to municipal convictions, but I honestly didn't look at the part about it being uncounseled. I didn't know whether Mr. Russell had counsel appointed, signed a waiver or done whatever at the time of this municipal conviction.
"[Defense counsel]: And that wasn't even an issue that was addressed in Burgess. It wasn't objected to in trial court. They reviewed it under plain error. But it talked merely to the conviction, didn't go any further, you know, whether you would have-to have the assistance of counsel.
"....
"THE COURT: ... If it was a plain error ... review and that were an issue even if it wasn't brought up, then wouldn't the Court have addressed it, do you think if they had an issue with it?
"[Defense counsel]: I don't think the Burgess opinion is clear on whether the record was clear of whether it was counseled or not. And I just think that's a-certainly is an issue we want to address now, not on some plain error review by the courts. Now, I think that that's important if it's an uncounseled municipal ordinance violation, then municipal court, you know, is people get put on probation as a collection to collect fines. I mean they're not put on supervised probation as in county court, state court felonies. Those type of probations are designed more to collect money for court cost.
"THE COURT: Okay. All right. I'll look at it and see, but again, that's my inclination is to let it in, if the State wants to offer it...."
(R. 1708-12.) Before the penalty phase commenced, Russell renewed his objection:
"THE COURT: We had a discussion yesterday about Burgess and [defense counsel] on behalf of the defendant had made an argument regarding that the conviction-the municipal conviction that the defendant was on unsupervised probation for was an un-counseled conviction, so we can discuss that some more if you need to, however y'all need to do.
"[Defense counsel]: Judge, we filed a written objection to that setting out our argument, and I will concede the point that Burgess never addressed that issue. We've reviewed it under a plain error. But I didn't see in the Burgess opinion where the record-where it showed whether or not in that situation the defendant was-in Burgess whether the defendant was represented by counsel. But clearly in this case that it was-that it's an uncounseled conviction, and the courts have not addressed that. So, I guess this may be an issue of first impression as it pertains to whether or not a municipal ordinance-if you have a suspended sentence and basically on supervised probation, can that qualify as an aggravator under 13A-5-46(1). We're objecting [to] it on the record, and, of course, we'll respect the court's opinion."
(R. 1718-19.)
Sheila Joy Feazell, chief clerk and custodian of records for the Anniston Municipal Court, certified a copy of Russell's third-degree-theft-of-property conviction, and the State introduced it as an exhibit. Feazell testified that Russell pleaded guilty to the offense on October 27, 2010, that he was sentenced to 180 days in the Anniston Municipal Jail, that Russell's sentence was split to serve 60 days followed by 24 months' unsupervised probation, and that at the time Russell committed the capital offense on August 24, 2011, he was serving the probationary portion of his sentence.
On cross-examination, Feazell testified:
*1193 "Q. ... [I]s there any indication on that document that he was represented by a lawyer?
"A. There is no indication.
"Q. Okay. Is there any indication on that document that he had waived his right to a lawyer?
"A. No.
"....
"Q. So according to this record, it appears that Joshua Russell showed up in court, pled guilty?
"A. Yes.
"Q. And was sentenced to-was put in the city jail for 60 days?
"A. Yes.
"Q. Without a lawyer?
"A. Yes."
(R. 1756; 1759-60.)
The circuit court subsequently instructed the jury with respect to the aggravating circumstance provided for under § 13A-5-49(1), Ala. Code 1975:
"The law of this State provides that the following shall constitute aggravating circumstances for your consideration during the sentencing phase of trial. The capital offense was committed by a person under sentence of imprisonment. 'Under sentence of imprisonment' means while serving a term of imprisonment, while under a suspended sentence, while on probation or parole or while on work release, furlough, escape, or any other type of release or freedom, while or after serving a term of imprisonment other than unconditioned release and freedom after expiration of a term of sentence."[35]
(R. 1969.) The jury unanimously found that Russell was under the sentence of imprisonment when he committed the capital offense. (C. 315.) In its order sentencing Russell to death, the circuit court noted that the jury unanimously found that aggravating circumstance to exist and concluded that, "after weighing the aggravating circumstances against the mitigating circumstances, the trial court finds that the aggravating circumstances outweigh the mitigating circumstances." (C. 354.) The court's order did not contain written findings concerning what weight, if any, it accorded that particular aggravating circumstance.
The record does not indicate that Russell was represented by counsel or that he knowingly, intelligently, and voluntarily waived his right to counsel for his municipal-court conviction. The Alabama Supreme Court has stated:
"A defendant's right to counsel in criminal prosecutions is guaranteed by the Sixth Amendment of the United States Constitution. This right is applied in the state courts through the Fourteenth Amendment. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed. 2d 799 (1963). The right to counsel is to be applied in misdemeanor cases involving a loss of liberty. Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed. 2d 530 (1972). In misdemeanor cases, however, the right applies only when the defendant is actually sentenced to jail. Scott v. Illinois, 440 U.S. 367, 99 S.Ct. 1158, 59 L.Ed. 2d 383 (1979).
"An uncounseled prior conviction cannot be used to support a finding of guilt *1194 or to enhance punishment. Burgett v. Texas, 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed. 2d 319 (1967) ; Ladd v. State, 431 So.2d 579, 580 (Ala. Crim. App. 1983). 'Thus, unless it is shown that the accused was represented by counsel, or waived counsel, at the time of his prior conviction, the conviction is not available for consideration under the Habitual Felony Offender Act. Watson v. State, 392 So.2d 1274, 1279 (Ala. Cr. App. 1980), cert. denied, 392 So.2d 1280 (Ala. 1981).' Ladd, 431 So.2d at 580. Nor is an uncounseled conviction available for consideration under § 13A-12-213[, Ala. Code 1975].[36 ]
" 'If an accused waives his right to counsel, that waiver must be intelligently and understandingly made and cannot be presumed from a silent record. Carnley v. Cochran, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed. 2d 70 (1962).' Lake v. City of Birmingham, 390 So.2d 36, 38 (Ala. Crim. App. 1980). The state must prove that the accused has waived the right to counsel. Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424, rehearing denied, 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed. 2d 240 (1977). 'The burden is on the State to show that a defendant's waiver of counsel was made knowingly and intelligently. Zuck v. Alabama, 588 F.2d 436 (5th Cir. 1979), cert. denied, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed. 2d 42 (1979).' Leonard v. State, 484 So.2d 1185, 1189 (Ala. Crim. App. 1985)."
"....
"The United States Supreme Court has held: 'Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which shows, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.' Carnley, 369 U.S. at 516, 82 S.Ct. at 890, 8 L.Ed. 2d at 77 (emphasis added). The record of Reese's previous conviction, though not completely silent, does not sufficiently show that Reese was offered counsel and that he knowingly and intelligently rejected that offer.
" 'A defendant may waive his or her right to counsel in writing or on the record, after the court has ascertained that the defendant knowingly, intelligently, and voluntarily desires to forego that right.' Rule 6.1(b), [Ala.] R. Crim. P. (emphasis added). There is no evidence that the judge in the municipal court engaged in the colloquy necessary to ascertain that Reese knowingly, intelligently, and voluntarily desired to forgo his right to counsel."
Ex parte Reese, 620 So.2d 579, 580-81 (Ala. 1993). See also Ex parte Shelton, 851 So.2d 96, 102 (Ala. 2000) ("[A] defendant who receives a suspended or probated sentence to imprisonment has a constitutional right to counsel.").
At the time Russell was convicted in municipal court in 2010, third-degree theft of property was codified as an offense under § 13A-8-5, Ala. Code 1975, and was classified as a Class A misdemeanor.[37] Russell was sentenced to 180 days in the Anniston municipal jail, and that sentence was split so that Russell could serve 60 days in jail followed by unsupervised probation; therefore, Russell had a right to *1195 counsel in that case. The record is ultimately silent as to whether Russell was actually afforded counsel or whether the judge in the municipal court engaged in the colloquy necessary to ascertain that Russell knowingly, intelligently, and voluntarily desired to forgo his right to counsel. The State, therefore, failed to meet its burden of proving that Russell was represented by counsel or that he validly waived his right to counsel before pleading guilty to the theft charge. Accordingly, the circuit court erred when it allowed the jury to consider that evidence during the penalty-phase proceeding. Furthermore, because the jury relied on that evidence to unanimously determine that Russell was under the sentence of imprisonment at the time he committed the capital offense, it was improper for the court to consider that aggravating circumstance when it overrode the jury's 8 to 4 recommendation that Russell be sentenced to life imprisonment without parole.
We must now decide whether that error warrants a reversal of the sentence and necessitates a new penalty-phase proceeding. The Supreme Court of Alabama addressed a similar issue in Ex parte Stephens, 982 So.2d 1148, 1151 (Ala. 2006) :
"In this case, the jury was instructed that three statutory aggravating circumstances potentially existed; the jury found all three aggravating circumstances existed and that they outweighed the mitigating circumstances. However, only two of those aggravating circumstances were actually available as statutory aggravating circumstances in this case. The question thus presented by this appeal is whether the incorrect instruction requires a new sentencing hearing....
"This Court decided a similar issue in Ex parte Williams, 556 So.2d 744 (Ala. 1987). In that case, the State erroneously pleaded as an aggravating circumstance that the defendant had been under sentence of imprisonment at the time of the offense.
" ' "[T]he trial court improperly instructed the jury, during the sentencing phase of the trial, that they could consider the fact that the capital offense was committed by a person under sentence of imprisonment as an aggravating circumstance, as provided in § 13A-5-49(1), Code of Alabama (1975). It was later established at the sentencing hearing, however, that the appellant was not on probation, nor was he on parole, at the time that the crime was committed." '
" 556 So.2d at 745 (quoting Court of Criminal Appeals's opinion, Williams v. State, 556 So.2d 737, 740-41 (Ala. Crim. App. 1986) ).
"In Williams, as in this case, the trial court realized that the jury had considered an invalid aggravating circumstance and the trial court considered only the valid aggravating circumstances in reaching its own sentencing decision. Nevertheless, this Court reversed Williams's death sentence. In doing so, the Court stressed the importance of the statutory right to a fair advisory verdict by the jury:
" 'The legislatively mandated role of the jury in returning an advisory verdict, based upon its consideration of aggravating and mitigating circumstances, can not be abrogated by the trial court's errorless exercise of its equally mandated role as the ultimate sentencing authority. Each part of the sentencing process is equally mandated by the statute ( §§ 13A-5-46, -47(e)); and the errorless application by the court of its part does not cure the erroneous application by the jury of its part .... To hold otherwise is to hold that the sentencing role of the jury, as required by statute, counts *1196 for nothing so long as the court's exercise of its role is without error.'
" 556 So.2d at 745."
982 So.2d at 1151.
In concluding that the trial court's error was not harmless, the Stephens court explained:
"An error in a penalty-phase jury instruction is subject to harmless-error review. Ex parte Broadnax, 825 So.2d 233, 236 (Ala. 2001). However, '[t]he harmless error rule is to be applied with extreme caution in capital cases.' Ex parte Whisenhant, 482 So.2d 1247, 1249 (Ala. 1984). To find the error in this capital case harmless, we must be able to state 'beyond a reasonable doubt' that a properly instructed jury would nevertheless have recommended a sentence of death. 482 So.2d at 1248. After reviewing the evidence presented of the aggravating circumstances and the mitigating circumstances, we cannot say with the necessary certainty that the error did not affect the jury's recommendation."
982 So.2d at 1154.
Here, as in Williams, supra, and Stephens, supra, the jury considered an invalid aggravating circumstance. Despite unanimously finding the aggravating circumstance-along with two valid aggravating circumstances-to exist, the jury recommended a sentence of life imprisonment without the possibility of parole by a vote of 8 to 4. The jury might have returned the same vote if it had been instructed on only the two valid statutory aggravating circumstances. We are unable to conclude beyond a reasonable doubt, however, that it would have done so.
Moreover, the circuit court also considered the invalid aggravating circumstance when it overrode the jury's sentencing recommendation. The court did not state in its sentencing order what weight, if any, it gave the invalid aggravating circumstance. See Burgess, 723 So.2d at 767 (holding that "the sentencer is free to assign [the aggravating circumstance that the capital offense was committed by a person under sentence of imprisonment] great weight or no weight at all"). Therefore, we cannot determine whether the circuit court used the invalid aggravating circumstance to enhance Russell's sentence.
Accordingly, because Russell's prior conviction possibly could have contributed to the jury's recommendation and possibly could have been used to enhance his sentence, we cannot say that this error was harmless. Therefore, we must reverse Russell's sentence of death and remand this case to the circuit court for that court to conduct a new penalty-phase proceeding wherein the jury is not presented with evidence of Russell's municipal-court conviction.
Conclusion
We affirm Russell's capital-murder conviction. Because, however, the jury considered an invalid aggravating circumstance during the penalty phase and the circuit court considered an invalid aggravating circumstance when it overrode the jury's sentencing recommendation, Russell's sentence of death is reversed, and this case is remanded to the circuit court for that court to conduct a new penalty-phase proceeding.[38]
AFFIRMED AS TO CONVICTION; REVERSED AS TO SENTENCE; AND REMANDED.
Welch, Kellum, and Burke, JJ., concur. Windom, P.J., concurs in part and dissents in part, with opinion.

Effective April 11, 2017, §§ 13A-5-45, 13A-5-46, and 13A-5-47, Ala. Code 1975, were amended to prohibit a judge from overriding a jury's sentencing verdict in a capital case. Section 13A-5-47 states: "This act shall apply to any defendant who is charged with capital murder after the effective date of this act and shall not apply retroactively to any defendant who has previously been convicted of capital murder and sentenced to death prior to the effective date of this act." Accordingly, those amendments do not apply here.

Beard is also identified as Justin Mason in the record.

Officer Sollohub was transported via ambulance to Northeast Alabama Regional Medical Center in Anniston before being transported via helicopter to UAB.

The name Russell gives is unclear from the video.

Dr. Ward testified that she was retired at the time of the trial.

Morgan testified that, at the time he analyzed Russell's telephone, he was a Special Deputy for the United States Secret Service. Morgan testified that he was a detective and forensic examiner for the City of Hoover at the time of the trial.

This claim appears as Issue XII in Russell's brief.

This claim appears as Issue VII in Russell's brief.

J.J. clarified that his knowledge of the case was limited to knowing that Russell had been accused of shooting and killing a police officer.

This claim appears as Issue VIII in Russell's brief.

Potential juror S.S., who was stricken by the State, did not indicate his race on his jury questionnaire, and his race is not otherwise apparent from the record.

Two Caucasians also served as alternate jurors. Including those jurors in the final jury, the four African-American jurors constituted 25% of Russell's jury. The alternates, however, did not participate in the jury deliberations.

This information was not adduced at voir dire; instead, it appears on the jury questionnaires of the 11 African-American veniremembers struck by the State.

This claim appears as Issue IX in Russell's brief.

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

This claim appears as Issue X in Russell's brief.

During the pretrial hearing on Russell's motion in limine, the State argued: "Dr. Ward can testify on this issue. Well, Dr. Ward is going to say, 'When I did the autopsy, that part of his body was missing.' That certainly is relevant of 'Where did it go?' " (R. 69.)

Morris testified that she is Officer Sollohub's mother.

We note that, before the State introduced the photograph at issue (State's Exhibit 1-A, C. 362), Russell objected to the admission of a different photograph (State's Exhibit 1, C. 359) on the ground that it was prejudicial. Specifically, Russell stated: "[I]t looks like he's at the beach, with a young kid draped around his neck. He does not have any children. It's designed solely to play to the emotions of this jury." (R. 485-86.) The State ultimately did not introduce the challenged photograph.

This claim appears as Issue III in Russell's brief.

This claim appears as Issue II in Russell's brief.

We note that the State, not the defense, elicited the evidence that Beard was threatened with incarceration for hindering prosecution before providing his second statement to police when it introduced the video-recorded statements Beard made to police on August 24 and August 25, 2011. Therefore, Russell did not impeach Beard with respect to this issue, and we view this argument as challenging the weight of the State's evidence and Beard's credibility as a witness. It is well settled that "[t]he weight and probative value to be given to the evidence, the credibility of the witnesses, the resolution of conflicting testimony, and inferences to be drawn from the evidence are for the jury." Smith v. State, 698 So.2d 189, 214 (Ala. Crim. App. 1996), aff'd, 698 So.2d 219 (Ala. 1997). Russell argued in closing statements that Beard's prior consistent statement was a result of coercion from the police. The jury ultimately returned a verdict of guilt; therefore, we cannot say that the jury viewed Beard's testimony and prior consistent statement as so incredible as to disregard it.

Mason did not identify Russell by name but as the person who shot Officer Sollohub.

Sgt. Grissom explained that the cameras in the patrol cars are activated by one of three methods: (1) the officer manually turns on the camera; (2) the officer turns on his lights and sirens; or (3) the officer reaches a certain rate of speed. In this instance, Officer Sollohub did not do any one of those three things that would have activated the camera.

Investigator Osburn testified that Sgt. Grissom did not give the video cards to him and that he did not know where they were. Investigator Tim Suits, the lead investigator in this case, likewise testified that he did not know the location of the video cards.
We further note that Russell claims that the State suppressed the video cards that, he says, were retrieved from Officer Bostick's patrol-car camera and Scorpion device. The record does not affirmatively indicate that anyone at the Anniston Police Department ever obtained those video cards. With respect to the video card from Officer Bostick's patrol car, Investigator Suits testified that he reviewed the recording of the interview between Sgt. Sparks and Officer Bostick, and, at some point during the interview, Sgt. Sparks and Officer Bostick left the interview room with the intention of retrieving the video card from Officer Bostick's patrol car. Investigator Suits testified that he did not know whether that video card was actually obtained, "where it went, who may have it, [or] who may have examined it." Investigator Suits further testified that he had "no idea what happened" to the video card from Officer Bostick's Scorpion device.

The knowledge of law-enforcement agents regarding favorable evidence is imputed to the prosecutor. See Duncan v. State, 575 So.2d 1198 (Ala. Crim. App. 1990).

Russell cites United States v. McCall, No. 2:13-CR-144, Jan. 8, 2014 (M.D. Ala. 2014)(not selected for publication in F. Supp.), and United States v. Saboonchi, 990 F.Supp.2d 536, 561 (D. Md. 2014), as examples of cases concerning lost or deleted digital files that have been recovered at a later time with the use of certain forensic tools. As the State points out, at the time the record on appeal was completed, Russell had not given any indication that he had been able to glean additional information from the corrupted video file the State produced at trial.

This claim appears as Issue VI in Russell's brief.

Our caselaw has recognized that counsel may make a strategic decision not to request a limiting instruction to avoid emphasizing collateral-bad-act evidence. See, e.g., Perkins v. State, 144 So.3d 457, 478 (Ala. Crim. App. 2012) ("It appears that counsel made a strategic decision not to request a limiting instruction on the use of the collateral-act evidence-an instruction that would have emphasized that Perkins's collateral bad acts were admissible to prove his intent.").

This claim appears as Issue XI in Russell's brief.

We note that the State used a peremptory strike to remove potential juror A.B. from the venire. Therefore, because the court made this statement during individual voir dire and because A.B. did not serve on the jury, the trial court's error, if any, was harmless. See Rule 45, Ala. R. App. P. Moreover, Russell did not object to this statement, and we do not find plain error in this instance. See Rule 45A, Ala. R. App. P.

This claim appears as Issue IV in Russell's brief.

Russell pleaded guilty in October 2010 to third-degree theft of property in violation of Ordinance No. 83-0-35 of the City of Anniston, which adopted former § 13A-8-5, Ala. Code 1975, and he was sentenced to 180 days in the Anniston Municipal Jail. That sentence was split, and Russell was ordered to serve 60 days' imprisonment followed by 24 months' unsupervised probation. Russell was serving the probationary portion of his sentence on August 24, 2011.

Burgess v. State, 723 So.2d 742 (Ala. Crim. App. 1997).

The circuit court also instructed the jury with respect to the aggravating circumstances that the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, see § 13A-5-49(5), Ala. Code 1975, and that the capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws, see, § 13A-5-49(7), Ala. Code 1975. The jury unanimously found those aggravating circumstances to exist.

Section 13A-12-213, Ala. Code 1975, codifies the offense of first-degree unlawful possession of marijuana.

Effective January 30, 2016, § 13A-8-5, Ala. Code 1975, was amended to codify the offense of fourth-degree theft of property and to classify that offense as a Class A misdemeanor. Effective January 30, 2016, third-degree theft of property is codified as § 13A-8-4.1, Ala. Code 1975, and that offense is classified as Class D felony.

Because we are reversing Russell's sentence, we pretermit discussion of the remaining issues with respect to the penalty phase and sentence.